Asel **ABDYGAPPAROVA**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–05–00321–CR.

Court of Appeals of Texas, San Antonio.

Oct. 17, 2007.

Discretionary Review Refused April 2, 2008.

Lori O. Rodriguez, Assistant Public Defender, San Antonio, TX, for Appellant.

Daniel Thornberry, Assistant Criminal District Attorney, San Antonio, TX, for Appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, PHYLIS J. SPEEDLIN, Justice, REBECCA SIMMONS, Justice.

## OPINION

Opinion by REBECCA SIMMONS, Justice.

This court's opinion and judgment dated July 25, 2007 are withdrawn and this opinion and judgment are substituted. We substitute this opinion to correct the reference to the presiding judge of the Fourth Administrative Judicial Region and clarify a few issues relating to this court's review of the trial court's rulings.

This appeal arises from a capital murder conviction with punishment assessed at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. Appellant Asel Abdygapparova presents ten points for review. We reverse the trial court's judgment and remand the cause to the trial court for a new trial.

FACTUAL BACKGROUND

On March 31, 2001, Appellant Asel Abdygapparova, a University of Texas at San Antonio (UTSA) student from Kazakhstan, was involved in the abduction and murder of Rosa Rosado in San Antonio, Texas. Five days after the murder, Abdygapparova told retired FBI agent Bruce Gatti about the abduction and murder she witnessed. Gatti contacted the San Antonio Police Department and then traveled with Abdygapparova to a Fuddrucker's restaurant to meet the police. During their meeting, Abdygapparova provided the officers with a detailed account of the events of March 31, 2001.

According to Abdygapparova's statement to officers and her testimony at trial, Abdygapparova, who was five months pregnant at the time, and her boyfriend, Ramon Hernandez, left their residence and picked up Ramon's friend, Santos Minjares. Ramon was driving, and Abdygapparova was in the back seat, when Santos grabbed Rosa Rosado, a woman waiting at a bus stop, and pulled her into the car. Santos then sat in the backseat of the car, with Rosado sitting between himself and Abdygapparova. Rosado's head was ultimately covered with a towel and duct tape.

After driving around for approximately half an hour, Ramon stopped at a motel and Santos instructed Abdygapparova to remove money from Rosado's purse and pay for a room. Abdygapparova complied, even providing her driver's license information to the motel clerk.[1] Ramon drove the car to the motel room and Santos took Rosado inside. Abdygapparova explained that she walked into the motel room to use the restroom and Santos instructed her to leave and obtain bleach and a douche from the house. Abdygapparova claimed she

---

1. There was some question raised whether Abdygapparova altered the last number on the license number.

followed Santos's instructions because she was afraid of him.

According to Abdygapparova, when she returned to the motel room, approximately ten or fifteen minutes later, she found Ramon and Santos, both clothed, and Rosado, laying on the bed, half-naked, but alive. Abdygapparova went into the restroom with Ramon while Santos raped Rosado. Ramon then insisted she leave and purchase a shovel at Wal–Mart. Abdygapparova complied and purchased a shovel, using a gift card. According to her testimony, before asking for assistance at Wal–Mart, she did not know the meaning of the word "shovel." When Abdygapparova returned to the motel room around 11:00 p.m., Santos answered the door and told her that " 'she [Rosado] is gone.' I [Abdygapparova] said 'what do you mean, you killed her.' He said 'yes, she is gone.' " Rosado's dead, naked body lay on the floor.

Abdygapparova further relayed that Ramon and Santos collected everything from the room, wrapped Rosado in a blue and red blanket, and placed her body in the back seat of the car. Santos sat in the passenger seat and Ramon instructed Abdygapparova to drive them to a clearing near UTSA where she dropped them off; she was told to return in thirty minutes. When Abdygapparova returned to the clearing, they again told her to leave. She complied and returned a short time later to pick them up. The three then drove to Ramon's residence where Abdygapparova participated in the destruction of Rosado's personal items. On April 2, 2001, Abdygapparova took the car used in the commission of the offense to Austin and traded the vehicle for a white Ford.

By all accounts, Abdygapparova fully disclosed the events, including her role, to the officers. She provided a five-page written statement, led the officers to Rosado's body and the motel, and even provided the gift card she used at Wal–Mart. Abdygapparova was not given any promises of immunity for her statements. Several officers testified that Abdygapparova appeared scared of both men, especially Santos, and even remained at the police station until both Ramon and Santos were in custody. Over four months later, on July 24, 2001, Abdygapparova was charged with the capital murder of Rosa Rosado.

## Procedural History

Abdygapparova was indicted in September of 2001 and received court-appointed counsel. After both Ramon and Santos were tried and convicted, Abdygapparova's case was set for trial on February 17, 2004. On November 5, 2003, three months before trial and two and a half years after indictment, the State filed its notice to seek the death penalty. On December 3, 2003, the trial court heard several pre-trial motions, including Abdygapparova's motion for an interpreter. During the hearing, the court denied the interpreter for voir dire, but did agree to have an interpreter available for any witness being called to testify needing assistance. Shortly thereafter, Abdygapparova retained different defense counsel. On January 8, 2004, a rather heated motion for substitution of counsel was heard before the trial court and ultimately granted, with specific instructions that, pursuant to the scheduling order, the court would not entertain any plea offers by the parties.[2] The trial was scheduled for the following year.

---

2. The trial court inquired, "[retained counsel], do you understand that a scheduling order was filed, was given to the attorneys? There were deadlines that were met by these

attorneys. The deadline for the plea bargain agreement came and went. There was no plea bargain agreement reached.... I can assure, you [retained counsel], that there will

The case was called for trial on January 14, 2005. Prior to the start of voir dire, defense counsel again urged the court to appoint an interpreter for Abdygapparova. Again, the trial court denied the request. After a hotly contested voir dire and trial on the merits, the jury convicted Abdygapparova of capital murder and assessed punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice.

Abdygapparova presents ten issues on appeal, including failure to recuse the trial court, violations of due process, improper admission of evidence and cumulative error. We sustain several of Abdygapparova's issues, including errors in the admission of evidence and improper ex parte communications amounting to a violation of due process.[3] Accordingly, we reverse the trial court's judgment and remand the cause to the trial court for a new trial.

## I. MOTION TO RECUSE TRIAL COURT JUDGE

Abdygapparova alleges the presiding judge abused his discretion by denying her motion to recuse the trial judge. She argues the trial judge was so biased and prejudiced against her that the trial amounted to a denial of due process of law. On November 18, 2004, Abdygapparova filed a motion to recuse the trial judge alleging that the trial judge's actions and comments exhibited a strong bias against her. After the trial judge denied the request, the motion to recuse was heard on November 30, 2004, before the presiding judge of the Fourth Administrative Judicial Region.

In an attempt to show the trial judge's bias, Abdygapparova presented the presiding judge with several examples of the trial judge's comments during a previous hearing.[4] Counsel also argued the trial judge's apparent anger toward Abdygapparova and her counsel suggested the judge appeared more worried about inconveniencing the State's witnesses than protecting Abdygapparova's rights. Finally, defense counsel argued, the trial judge previously presided over the trials of the two co-defendants, resulting in a predetermination of Abdygapparova's guilt that precluded a fair and impartial trial.

### A. Standard of Review

An appellate court reviews an order denying a motion to recuse under an abuse of discretion standard. *De Leon v. Aguilar*, 127 S.W.3d 1, 5 (Tex.Crim.App. 2004); *Arnold v. State*, 853 S.W.2d 543, 544 (Tex.Crim.App.1993) (en banc) (applying Texas Rule of Civil Procedure 18a to criminal cases). Because this standard requires a determination that the court acted without any guiding rules and principles, the trial court abuses its discretion only if the ruling on the motion was not within

---

be no plea bargain agreement accepted by this Court. I can tell you that right now, without reservation. That is not going to be an option in this case."

3. Because our findings with regard to the ex parte communications are dispositive of this appeal, we need not address Abdygapparova's issues three (ineffective assistance of counsel), six (prosecutorial misconduct) and ten (cumulative error). *See* TEX.R.APP. P. 47.1 (encouraging concise opinions addressing only those issues "necessary to final disposition of the appeal").

4. Some examples of the comments included: "This Defendant is quite intelligent. I suppose that it's no big deal to her to spend a year, another year in jail, but as far as Ms. Rosado's family is concerned, they have been waiting a long time for justice;" "Isn't it ironic, [Counsel], that the taxpayers of this county had to pay for an outfit for this Defendant and yet you received a retainer?" and "I think her actions speak louder than words."

the zone of reasonable disagreement. *Kemp v. State*, 846 S.W.2d 289, 306 (Tex. Crim.App.1992); *see also Bruno v. State*, 916 S.W.2d 4, 6 (Tex.App.-Houston [1st Dist.] 1995, pet. ref'd) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985)) ("The test for abuse of discretion is whether the court acted without reference to any guiding rules and principles; it is not whether ... the facts present an appropriate case for the trial court's action."). Furthermore, in the absence of a clear showing to the contrary, an appellate court presumes the trial court was neutral and detached. *Steadman v. State*, 31 S.W.3d 738, 741 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd). "The determination of whether recusal is necessary must be made on a case-by-case fact-intensive basis." *McCullough v. Kitzman*, 50 S.W.3d 87, 89 (Tex.App.-Waco 2001, pet. denied).

## B. Analysis

■ Abdygapparova contends the trial judge's comments and rulings show a clear bias. When bias is alleged as a ground for recusal, the recusal of a judge is appropriate *only if* the movant provides sufficient evidence to establish that a reasonable person, knowing all the circumstances involved, would harbor doubts as to the impartiality of the judge. *Kemp*, 846 S.W.2d at 305. *See* TEX.R. CIV. P. 18b. Only when the bias attains a level denying the movant due process of law is recusal warranted. *Kemp*, 846 S.W.2d at 305; *McClenan v. State*, 661 S.W.2d 108, 109 (Tex.Crim.App.1983) (overruled on other grounds) (holding that the defendant must demonstrate the court's bias denied his

right to due process). Additionally, the terms "bias" and "prejudice" do not encompass all unfavorable rulings towards an individual or her case, but instead must "connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess ..., or because it is excessive in degree." *Liteky v. United States*, 510 U.S. 540, 550, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). As such, the proponent must show a "deep-seated favoritism or antagonism that would make fair judgment impossible." *Id* at 555, 114 S.Ct. 1147.

■ Bias sufficient to warrant recusal generally stems from an extrajudicial source [5] and results in an outcome "on the merits" based on information outside of what the judge learned from participating in the case at hand. *See Quinn v. State*, 958 S.W.2d 395, 402–03 (Tex.Crim.App. 1997); *Kemp*, 846 S.W.2d at 305–06; *but see Liteky*, 510 U.S. at 551, 114 S.Ct. 1147 ("It is wrong in theory, ... to suggest ... that 'extrajudicial source' is the *only* basis for establishing disqualifying bias or prejudice. It is the only *common* basis, but not the exclusive one, since it is not the *exclusive* reason a predisposition can be wrongful or inappropriate.") (emphasis original). The court enjoys a presumption of judicial impartiality which is not defeated by the mere assertion of bias based on a trial judge's previous judicial relationship with a defendant. *Durrough v. State*, 620 S.W.2d 134, 143 (Tex.Crim.App.1981). More specifically, information that a trial judge gained about a defendant's case

---

**5.** "Black's Law Dictionary describes .... *extrajudicial* as ... something taking place 'outside court' or 'outside the functioning of the court system.'" Thus, "[t]he plain language meaning of extrajudicial suggests that a statement made within a judicial proceeding, and repeated in a judicial proceeding, cannot be from an extrajudicial source." *See Roman v. State*, 145 S.W.3d 316, 321 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd) (citing BLACK'S LAW DICTIONARY 606 (7th ed.1999)).

from previously trying a co-defendant is not information gained from an extrajudicial source. *Roman v. State,* 145 S.W.3d 316, 321 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd).

### C. Conclusion

The high standard for recusal set forth by the Court of Criminal Appeals gives a trial court broad discretion to express itself and its opinions. Statements may well show the trial judge was critical, disapproving and even hostile toward Abdygapparova and her counsel, but "[e]xpressions of impatience, dissatisfaction, annoyance, and even anger" in the ordinary conduct of courtroom administration do not establish bias. *See Liteky,* 510 U.S. at 555, 114 S.Ct. 1147.

At the hearing on the recusal, Abdygapparova relied on a transcript of the January 9, 2004 motion for continuance, the trial judge's alleged dislike of Abdygapparova and her counsel and Abdygapparova's testimony as evidence of the trial judge's bias. In separate issues in her brief, Abdygapparova also provides examples of bias *throughout the trial* to support her impartiality argument; however, in determining whether the presiding judge erred in denying the motion to recuse, we are bound by the evidence before the presiding judge at the time of the hearing on the motion. Accordingly, based on the evidence before the presiding judge at the time of the hearing, we cannot say he abused his discretion in failing to find a violation under Rule 18a of the Texas Rules of Civil Procedure. Abdygapparova's first issue on appeal is overruled.

## II. Failure to Provide an Interpreter

Abdygapparova argues that because she could not speak or understand English well enough to respond to questioning or understand the proceedings, the trial court's denial of several requests she made for an interpreter violated her due process rights guaranteed by the Fourteenth Amendment. U.S. Const. amend. XIV, § 1.

### *Additional Facts*

On December 2, 2003, Abdygapparova's court-appointed attorneys jointly filed a motion requesting the trial court to appoint an interpreter in accordance with Article 38.30. Tex.Code Crim. Proc. Ann. art. 38.30 (Vernon Supp.2006)[6]. During the January 6, 2004 hearing, appointed counsel explained that:

> "[Asel] is from Kazachstan [sic], ... even though she does understand some English, ... because of the nature of this case and the fact that the State is seeking the Death Penalty, we are compelled to ask the Court to have an interpreter to protect her rights."

In response, the State offered Abdygapparova's testimony from a bond reduction hearing almost two years prior and called several witnesses[7] to establish Abdygapparova's ability to understand and speak the English language. During the hearing, the prosecutor's stated opposition was "the concept of incurring the daily hourly costs of having an interpreter ... come from out of town ... at taxpayers' expense, when it's not appropriate or necessary." The trial court denied the use of an interpreter during voir dire and trial, but

6. Article 38.30 was amended in 2005 by Act of May 24, 2005, 79th Leg., R.S., ch. 956 § 1, 2005 Tex. Gen. Laws 3227. The amendment did not materially effect subsection (a).

7. The State called the officer who took the original statement in April of 2001, the individual charged with overseeing the international program at UTSA, and an Assistant Criminal District Attorney.

initially agreed to permit the use of an interpreter for any testifying witness requiring an interpreter.

Approximately one year later, on December 7, 2004, Abdygapparova's newly retained counsel re-urged the prior motion requesting the appointment of an interpreter for the entire proceeding, explaining that Abdygapparova's limited understanding of the English language prevented her from fully communicating with counsel and from understanding the entire process. Defense counsel explained that Abdygapparova's difficulties in translating and communicating required additional time on the part of counsel to explain concepts, and that extra time would not be available during trial.[8] The trial court denied the motion finding that, although Abdygapparova may not understand all the words used at trial, she understood enough to know "what is going on." The trial court then revised her earlier ruling that allowed an interpreter for witnesses incapable of communicating and denied an interpreter for "*all phases* of the trial." On January 19, 2006, prior to the start of voir dire, Abdygapparova's trial counsel once more provided specific examples of Abdygapparova's English language difficulties and requested an interpreter. Again, the trial court denied the request finding "she has a rational and factual understanding of the proceedings against her."

## A. Standard of Review

▆▆▆▆ The Sixth Amendment to the Constitution guarantees an accused the right to be confronted with the witnesses against her. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Vargas v. State*, 627 S.W.2d 785, 787 (Tex.App.-San Antonio 1982, no pet.) (holding that an accused's right to an interpreter is based on "constitutional and statutory guarantees of confrontation under the statutes and Constitutions of Texas and of the United States"). "One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom [during] his trial." *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *accord United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). Because the right to be present includes the right to understand the testimony of the witnesses, providing an interpreter to an accused who does not understand English is required by the Confrontation Clause and Texas law. TEX.CODE CRIM. PROC. ANN. art. 38.30(a); *Baltierra v. State*, 586 S.W.2d 553, 559 n. 9 (Tex.Crim.App.1979) (superseded by statute codified at TEX.CODE CRIM. PROC. ANN. art. 38.30); *Miller v. State*, 177 S.W.3d 1, 5–6 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (concluding this right is "simply lost to an accused who, because of a language barrier, is deprived of the ability to test the credibility of a material witness through cross-examination"). The right to an interpreter is a statutory right and must be implemented unless expressly waived. *Marin v. State*, 851 S.W.2d 275, 279 (Tex.Crim.App.1993) (*rev'd on other*

8. Counsel explained:
 Although she does have a limited understanding of the English language and a limited ability to communicate, I do not believe that she is fully able to communicate. There are many words that are used in the trial process, in the entire process, that she is not able to understand fully and needs clarification on, and in light of the fact that I need to be able to communicate with her, she needs to be able to understand the Court, she needs to be able to understand the District Attorney, that for me to be able to be effective with her, I believe is absolutely necessary.

*grounds*, 891 S.W.2d 267 (1994)). However, the determination of whether an interpreter is necessary rests largely in the discretion of the trial court. *Baltierra*, 586 S.W.2d at 556–57.

## B. Texas Code of Criminal Procedure Article 38.30

■ Article 38.30 of the Texas Code of Criminal Procedure provides that upon filing a motion for the appointment of an interpreter, if it is determined that a person charged or a witness does not understand and speak the English language, an interpreter must be sworn to interpret for him. TEX.CODE CRIM. PROC. ANN. art. 38.30. In *Hernandez v. State*, 862 S.W.2d 193, 198 (Tex.App.-Beaumont 1993, pet. ref'd), the court identified the two-prong test: (1) the defendant must show an inability to understand English; and (2) the defendant must make a timely request for an interpreter. *See also Garza v. State*, 04–96–00782–CR, 1997 WL 438757, *5 (Tex.App.-San Antonio 1997, no pet.). Because multiple requests were made, we only need address the first prong.[9]

### 1. *Abdygapparova's Ability To Understand English*

**9.** Although the State argues waiver under Rule 33.1(a), Abdygapparova's counsel made at least three formal requests for an interpreter. The trial court made it very clear she would not entertain additional argument from counsel, and that once she made a ruling, there would be no further discussion. In light of the multiple attempts by defense counsel to secure an interpreter, we reject the State's contention that Abdygapparova waived this issue

**10.** Much of this evidence was presented to the trial court by witnesses brought by the State. We find it difficult to understand the policy considerations against providing Abdygapparova with an interpreter, particularly in a death penalty case. Here, the State opposed

■ "[T]he mere fact that an accused may be more fluent in [another language] does not, in and of itself, make it incumbent upon a trial court to appoint an interpreter for an accused who speaks and understands the English language." *Flores v. State*, 509 S.W.2d 580, 581 (Tex.Crim. App.1974). Without question, there was evidence that Abdygapparova was capable of communicating in English. Although UTSA required her to take remedial English classes, she apparently could understand and communicate in the English language on a day-to-day basis.[10]

Abdygapparova relies on *Miller v. State*, 177 S.W.3d 1, 5 (Tex.App.-Houston [1st Dist.] 2004, no pet.), wherein the defendant " 'could not speak English well enough to be reliable' " and " 'could not be effectively cross-examined [as] he could neither understand the questions, nor repeat many answers that [had] been attributed to him by the investigating officer.' " The evidence shows that although Abdygapparova could read, write, speak and understand English, her ability was on a remedial level.[11] *Cf. Hernandez v. State*, 862 S.W.2d 193, 197 (Tex.App.-Beaumont 1993, pet. ref'd) (admonishing the trial court for its "denial of appellant's motion for an interpreter [which equated to] appellant

providing an interpreter for Abdygapparova because of the cost, while simultaneously incurring the expense of an interpreter who arrived on February 16, 2005 and remained on standby at a local hotel until February 23, 2005, when he was used for the second to last defense witness.

**11.** Sylvia Mendez, with UTSA, testified Abdygapparova "passed" a test demonstrating the minimum standards required for students to take classes in English. Mendez explained that any score between 500 and 599 allows a student to take classes in English, but requires remedial English instruction. Abdygapparova received a 503, which allowed her to attend classes in English, but required she take a remedial English class.

... being penalized because he understands and speaks *some* English"). The State responds that Abdygapparova's statement to the police and her testimony at pretrial hearings and trial show Abdygapparova's English proficiency, which is bolstered by an impressive academic background, including three degrees from Kazakhstan institutions and her admission to UTSA's statistics program. *Cf. Vargas v. State*, 627 S.W.2d 785, 787 (Tex.App.-San Antonio 1982, no pet.) (reasoning that because the record as a whole reflected the defendant communicated well in English, the trial court's failure to provide an interpreter was not error).

### 2. *Defense Counsels' Difficulties Communicating*

Both Abdygapparova's appointed counsel and her retained counsel moved for an interpreter, detailing their difficulties in communicating with Abdygapparova and emphasizing the need for an interpreter during a long and complicated trial involving a potential death penalty. *Cf. Sanchez v. State*, 122 S.W.3d 347, 354 (Tex.App.-Texarkana 2003, pet. ref'd) (concluding that an interpreter may be required for a non-English speaking defendant because an attorney must be able to communicate with his or her client in order to effectively represent the client). Additionally, both of Abdygapparova's attorneys represented to the court that although they could communicate directly with Abdygapparova, the interpreter was needed during the trial so that the attorneys could direct their attention to acting as an advocate for their client rather than on rephrasing the testimony from the witness stand.

### 3. *Attorney As Interpreter*

As an alternative to a translator, the trial court and the State suggested that defense counsel could act as an interpreter for her client. In *Guerrero v. State*, 143 S.W.3d 283, 284 (Tex.App.-Waco 2004, no pet.), the court addressed a defendant's right to simultaneous translation of proceedings as follows:

> In the context of a vigorously contested trial for example, an interpreter/attorney's duty to interpret may unnecessarily distract from his duty to plan and execute a trial strategy designed to provide zealous representation of the accused. Conversely, in a straightforward guilty-plea proceeding, an attorney might simultaneously serve as interpreter without much difficulty or distraction.

*Id.* In this case, with the death penalty being sought, it was imperative that Abdygapparova understand the proceedings, and that her counsel not be diverted from the trial. Both appointed and retained counsel expressed their inabilities to act as both interpreter and advocate for their client in their requests for the trial court to appoint an interpreter.

### C. Conclusion

■ Importantly, this was not a plea bargain or a simple trial where the use of the attorney to "interpret" or rephrase was for a short period of time. Instead, Abdygapparova's trial was a complicated capital murder case wherein the jury was asked to assess death. Of great concern in this case, however, is that the trial court and the State appeared to be "more concerned about the cost of the translator than the plight of the defendant." *See Hernandez v. State*, 862 S.W.2d 193, 197 (Tex.App.-Beaumont 1993, pet. ref'd). Ironically, the interpreter remained in a San Antonio hotel room, for most of the guilt-innocence phase of the trial, simply waiting to be called. Yet, despite our tremendous concern that expense was given more weight than Abdygapparova's constitutional right to confrontation, we remain mindful that the trial judge was in a position to observe Abdygapparova, and we

cannot disturb the decision of the trial court absent a demonstrated abuse of discretion. Based on the arguments of counsel and her personal observations of Abdygapparova, the trial judge determined Abdygapparova maintained a sufficient understanding of the English language and understood "what was going on." Because the trial court's decision was based on facts identified in the record, we cannot say her findings were arbitrary or capricious. Therefore, constrained by the applicable abuse of discretion standard of review, we overrule Abdygapparova's second issue on appeal.

### III. ADMISSION OF EXHIBIT # 181

Abdygapparova asserts that the trial court erred in admitting State's Exhibit # 181 and testimony surrounding the same. Exhibit # 181 is a letter written to Abdygapparova, while she was in custody, allegedly by Jack Fetter. The letter is Fetter's very graphic fantasy of Abdygapparova and Fetter engaged in sexual activities with a second female. Over defense objections based on relevance, authentication and lack of notice, the State offered the letter as impeachment evidence of Abdygapparova's sexual interest in women. More specifically, Abdygapparova was charged with the sexual assault of Rosado and the letter was offered as evidence that Abdygapparova liked having sex with other females and that she had "lived the fantasy" expressed in the letter.

### A. Standard of Review

 The standard of review for the admissibility of evidence is abuse of discretion. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000). An abuse of discretion occurs when a trial court's decision lies outside the zone of reasonable disagreement. *Id.* In determining whether a trial court has abused its discretion, we consider whether the court acted arbitrarily or unreasonably, that is, without reference to guiding rules or principles. *Lyles v. State*, 850 S.W.2d 497, 502 (Tex.Crim. App.1993).

### B. Waiver

 In its brief, the State asserts that Abdygapparova did not preserve her complaint for appellate review. In fact, defense counsel did timely object—on several different grounds. The general requirement for preservation of error is set forth in Rule 33.1(a) of the Texas Rules of Appellate Procedure. TEX.R.APP. P. 33.1(a). Succinctly, the Rule requires "a timely, specific objection and a ruling by the trial court" to preserve a complaint for appellate review. *Mendez v. State*, 138 S.W.3d 334, 341 (Tex.Crim.App.2004). The record clearly shows that the defense objected to the exhibit as improper impeachment, more prejudicial than probative, improperly authenticated and irrelevant. The trial court overruled the objection and, thus, Abdygapparova's objections were properly preserved for review. TEX.R.APP. P. 33.1(a).

### C. Texas Rules of Evidence 401 and 613

 The State contends that Abdygapparova's sexual orientation is relevant to the sexual assault of Rosado and thus the letter was relevant under Texas Rule of Evidence 401. Rule 401 states that evidence is relevant *only* if it tends to make "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. The letter sent to Abdygapparova by a man, living in another state and whom she had never met, outlining his sexual desires and fantasies with Abdygapparova and other women, does not tend to make *anything as to Abdygapparova,*

much less her sexual orientation or whether she committed sexual assault, any more or less probable and is therefore not relevant.

■■■■■ The State next asserts that Fetter's letter was admissible to impeach Abdygapparova's trial court testimony that she never had sex with another woman. *See Montgomery v. State*, 810 S.W.2d 372, 376 (Tex.Crim.App.1990) (discussing what makes evidence relevant). Texas Rule of Evidence 613(a) pertains to "*a prior inconsistent statement made by the witness.*" TEX.R. EVID. 613(a) (emphasis added). If the admission is partial, qualified, or otherwise equivocal, or if the witness claims to not remember making the prior statement, the prior statement is admissible for impeachment purposes. *See McGary v. State*, 750 S.W.2d 782, 786 & n. 3 (Tex. Crim.App.1988) (en banc). If the witness denies making the statement, then extrinsic evidence of the prior inconsistent statement may be offered. *Id.* at 786. If the witness admits making the prior inconsistent statement, extrinsic evidence of the prior inconsistent statement is inadmissible. *Id.* Regardless, it must be a statement made *by the witness.*

Here, the statement offered by the State is an unauthenticated letter, written by a third party and sent to Abdygapparova at the county jail. Thus, because the statement was not her own, the trial court erred in admitting the evidence under Rule 613. Accordingly, Fetter's letter was not relevant to anything at issue, was not proper impeachment and the trial court erred in admitting the letter under Rules 401 and 613.[12]

12. Because our holding regarding ex parte communications, discussed in Section V of this opinion, is dispositive of the appeal, we do not undertake a harm analysis on this issue.

## IV. THE ADMISSION OF STATEMENTS MADE DURING THE COURSE OF PLEA NEGOTIATIONS

Abdygapparova next asserts that it was improper for the trial court to allow the State to cross examine Abdygapparova with statements made during the course of her plea negotiations. In addition to violating Rule 410 of the Texas Rules of Evidence, the prosecutor's cross examination questions regarding these negotiations injected unsworn testimony from the prosecutor's own memories and notes, ultimately amounting to a swearing match between the prosecutor and the defendant. As such, the State obliterated the line between the State as an advocate and the State as a witness and denied Abdygapparova due process of law. *See Brown v. State*, 921 S.W.2d 227, 231 (Tex.Crim.App. 1996) (Keller, J., concurring) ("[D]ue process and fundamental fairness require a separation between the State's advocates and its witnesses.").

### A. The Plea Negotiations

During the direct examination of Abdygapparova, defense counsel asked whether the April 5, 2001 statement was her complete recollection of the events. Abdygapparova testified that some details were left out and that she had mentioned this to her previous attorney and the prosecutor. The State then argued Abdygapparova "opened the door" and proceeded to ask questions about statements, not included in the April 5, 2001 statement, but made during plea negotiations. Over defense objection, the State continued to ask questions, including many "Did you tell me on May 21st that ..." questions.[13] During the

13. Some examples of these questions are as follows:

State: When you told the jury last week that you had met with Sergeant Kellogg and told

motion for new trial, all parties agreed the meetings on May 21st and May 22nd, 2002, attended by Abdygapparova, her attorney, and two district attorneys, were plea negotiations held in accordance with Texas Rule of Evidence 410. Generally, statements made in the course of plea discussions are inadmissible. TEX.R. EVID. 410.

### 1. Negate a False Impression

■ The State asserts that because Abdygapparova testified regarding a statement made during the plea negotiations, the defense "opened the door" and the remaining parts of the statement were also admissible. See TEX.R. EVID. 410, 106, 107; Abdel–Sater v. State, 852 S.W.2d 671, 673 (Tex.App.-Houston [14th Dist.] 1993, pet. ref'd). A witness opens the door to otherwise inadmissible evidence if, while testifying, the witness creates a false impression using "another statement made [during] the same ... plea discussions." TEX.R. EVID. 410. See Neugebauer v. State, 974 S.W.2d 374, 376–77 (Tex.App.-Amarillo 1998, pet. ref'd) ("It is only when the defendant offers statements made during plea bargain discussions that the State may, in the interest of fairness, offer other statements made during the same plea bargain discussions."); Roberts v. State, 29 S.W.3d 596, 601 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd) (holding that "when a defendant voluntarily or nonresponsively testifies concerning extraneous matters on cross-examination, the State may correct any false impression presented by such answer."). We cannot see how Abdygapparova's responses, during cross-examination by the State, left a false impression with the jury. Abdygapparova acknowledged that she told the officer "the truth," that some details may have been left out of her April 5, 2001 statement, and that she had previously told the prosecutor "the exact same story." The State's cross-examination questions were simply attempting to prompt and maneuver the defendant to "open the door." See Lopez v. State, 928 S.W.2d 528, 531 (Tex.Crim.App.1996). The State fails to point to any testimony by Abdygapparova regarding a statement made during the plea bargain discussions that opened the door to the cross-examination by leaving a false impression. Accordingly, Abdygapparova's statements made during plea negotiations were not admissible to negate a false impression.

him what happened, you told him everything, you told him the truth, right?

Appellant: When I met both of them.

State: And then you went on and you told the jury that you had told me this exact same story, didn't you?

Appellant: Yes.

State: Okay. But the fact is, you told me many other things that you have not admitted to this jury didn't you?

Defense: And I would just object, Your Honor, that now the prosecutor is making himself a witness in this case.

State: No. The Defendant has made me a witness, Your Honor.

Court: The Defendant, or rather the defense's objection is overruled. You may proceed.

. . .

State: But you didn't tell the jury about the light from the TV. That was something you told me and [the prosecutor], right?

Appellant: Right.

State: Okay. So, you didn't tell the jury the truth about the lighting conditions and you were able to see what was going on in that room just fine, weren't you?

Appellant: No. The light was by the restroom area.

. . .

State: Now, isn't true that after Santos raped Rosa, that he offered her to you?

Appellant: No. That's not true.

State: Do you remember telling [the other prosecutor] and myself that was true?

Appellant: No.

State: Back on May 21st of 2002.

Appellant: No.

State: Do you deny it?

Appellant: I didn't say that.

State: Well, yes, you did.

### 2. *Impeachment*

 The State also argues that the prosecutor's questions were proper impeachment based on the discrepancies in Abdygapparova's testimony. Abdygapparova contends the only exception to Rule 410 arises when the defendant introduces a part of the plea discussion and introduction of other parts is necessary to prevent the jury from obtaining a distorted view of the discussion. She further argues that no exception exists allowing use of the evidence for impeachment. *Bowie v. State*, 135 S.W.3d 55, 65 (Tex.Crim.App.2004). In a similar case, *Taylor v. State*, 19 S.W.3d 858, 862–63 (Tex.App.-Eastland 2000, pet. ref'd), the prosecutor impeached the defendant with a statement made during plea negotiations. The State argued that it took measures not to reveal that the statement was made during plea negotiations, but instead offered only the substance of the information for impeachment. *Id.* at 863. The *Taylor* court held that because no such discussions were in evidence at the time the prosecutor used the statements in question, as is the situation here, the admission was "clearly error." *Id.*

### B. Protections Afforded by Rule 410

 Here, the prosecutor's cross-examination was an attempt to show that Abdygapparova was lying to the jury based on her statements made during the plea negotiations. Because the plea bargaining process is recognized as an important and necessary integral aspect of the criminal justice system, Rule 410 protects statements made during plea negotiations. *Wayne v. State*, 718 S.W.2d 393, 396–97

(Tex.App.-Dallas 1986), *rev'd on other grounds*, 756 S.W.2d 274 (Tex.Crim.App. 1988). "[A] defendant, in the course of plea negotiations must be free to negotiate settlements without fear that his statements will later be used against him." *Id.* Only when *the defendant* offers statements made during plea bargain discussions may the State, in the interest of fairness, offer other statements made during the same plea bargain discussions. *Taylor*, 19 S.W.3d at 863. Moreover, Rule 410 should bar the use of pleas and plea related statements for impeachment. *Id.* Thus, the trial court erred in allowing the State to proceed with questions relating to statements made during plea negotiations.[14]

## V. Ex Parte Communications

Abdygapparova next asserts the trial court improperly engaged in ex parte communications with the prosecutor in violation of her due process rights. Because the right to a fair and impartial judge is fundamental to our system of justice, a criminal trial court's primary duty is to see that justice is done by assuring a fair trial with constitutional and statutory guarantees of due process. *See* U.S. Const. amends. V, VI, XIV; Tex. Const. art. 1 § 19; *Hajjar v. State*, 176 S.W.3d 554, 565 (Tex.App.-Houston [1st Dist.] 2004, pet. ref'd) (citing *Estes v. Texas*, 381 U.S. 532, 539–40, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965)). Specifically, Abdygapparova complains that the prosecutor and the trial court exchanged numerous "notes" during the voir dire process.[15] These notes discussed Abdygapparova's ability to communicate with her counsel, defense counsel's voir dire of at least two of the venire

---

14. Because our holding regarding ex parte communications, discussed in Section V of this opinion, is dispositive of this appeal, we do not undertake a harm analysis on this issue.

15. In this case, voir dire was accomplished by questioning each juror, in a room separate from the rest of the panel.

members, the hairstyle of one of the venire members, the State's presentation of the law to the venire, the prosecutor's line of questioning of one of the venire members, time limits on voir dire, and an update on unrelated proceedings in the courthouse.

## ADDITIONAL FACTS

On January 28, 2005, after the voir dire of Prospective Juror No. 48 and outside the presence of any potential jurors, defense counsel inquired about notes being written between the trial court and the prosecutor during the voir dire of potential jurors. "But in fundamental fairness to my client in this case, [Abdygapparova] clearly has the right to an impartial tribunal. And if there are ex-parte communications going on, which I saw them, she saw them, we all saw them ... I would ask that they be entered into evidence and read into the record." The trial court proceeded to ask the State to read any notes that were not work product into the record.[16] Abdygapparova argues that these notes reflect such bias that they compromised her right to a fair and impartial tribunal.

## A. Notes Exchanged During Voir Dire

### 1. *Ex Parte*

 Ex parte communications "involve fewer than all of the parties who are legally entitled to be present." *In re Thoma,* 873 S.W.2d 477, 496 (Tex. Rev. Trib. 1994, no appeal) (citing Jeffrey M. Shaman, et al., *Judicial Conduct And Ethics,* § 6.01 at 145 (1990)).[17] Because of their inherent secretiveness, these communications are barred in an effort to ensure that all legally interested parties are given their "full right" to be heard under the law and to ensure equal treatment of all parties. *Id.* See *United States v. Arroyo–Angulo,* 580 F.2d 1137, 1145 (2d Cir.1978) (Closed proceedings "are fraught with the potential of abuse and, absent compelling necessity, must be avoided."). As the State acknowledges, the communications were between the prosecutor and the trial court and made with the expectation that the notes would remain private between

---

16. The following are examples of some of the notes:

State: I have observed no problems in communications between Asel and [trial counsel].

Court: And she didn't purchase a Russian–English dictionary.
...
State: Like she's really going to take him (the potential juror).

Court: She's surprised me before.
...
Court: Why didn't you do a PowerPoint presentation on these questions, and 17.02, with regard to the Death Penalty questions.
...
State: I don't know how I will be able to change (with regard to the presentation of his case), at least soon; but this has been a learning experience for me to *observe* a juror being totally confused, because none of the terms [defense counsel] is using make sense. "Arms of scale," "jury charge," *etc.*

...
Court: This is entirely *too* long. 40 min. shd (sic) be sufficient.
....
Court: Do you want a time limit?
...
State: Did [prosecutor] just call him old?.

Court: My doctor said, mature persons can't eat what they used to-he was trying to be diplomatic.
...
State: Do you think I'd look good with hair that color (referring to one of the venire)?

Court: Why don't you try it. I'm afraid you could try a soft brown with highlights!

17. *See also* Black's Law Dictionary, which defines an ex parte hearing as one "in which the court or tribunal hears only one side of the controversy." BLACK'S LAW DICTIONARY 517 (5th ed.1979).

the two of them. They, therefore, constitute ex parte communications.

The very tenets of our judicial system require the defendant to be present and a part of the public proceedings. "The spirit and genius of our Codes are opposed to any and every thing which militates against a *fair, open* and public trial. No step in the *trial* can be taken in the absence of the defendant. If allowed to be done or had secretly, his presence would be a mockery,—a very serious farce to defendant." *Conn v. State*, 11 Tex.App. 390, 1882 WL 9159, *5 (Tex.Ct.App.1882) (emphasis original). Based on these well grounded principles, our rules and case law strongly discourage ex parte communications, with very limited, extraordinary, emergency exceptions. See *Barnes v. Whittington*, 751 S.W.2d 493, 495 n. 1 (Tex.1988). Thus, the Texas Code of Judicial Conduct specifically prohibits a judge from initiating, permitting or considering ex parte communication concerning the merits of a proceeding. TEX.CODE JUD. CONDUCT, Canon 3(B)(8), reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B. (providing that a judge shall not permit or consider improper ex parte or other private communications regarding the merits of a pending or impending judicial proceeding).

Ex parte communications are prohibited because they are inconsistent with the right of every litigant to be heard and with maintaining an impartial judiciary. When a judge takes the side of one party, whether expressly or implicitly, the court creates an additional opponent in the courtroom for the other litigant. *See* 48A ROBERT P. SCHUWERK & LILLIAN B. HARDWICK, TEXAS PRACTICE: HANDBOOK OF TEXAS LAWYER AND

JUDICIAL ETHICS § 27.5 (2006–2007).[18] In *Tamminen,* we explained:

> To avoid further erosions of confidence that our courts do, indeed, treat all litigants with equal fairness, judges and prosecutors alike must keep themselves, like Caesar's wife, above suspicion by scrupulously avoiding situations in which their fairness and integrity could appear to be compromised.

*Tamminen v. State*, 644 S.W.2d 209, 218 (Tex.App.-San Antonio 1982), *aff'd,* 653 S.W.2d 799 (Tex.Crim.App.1983).

### 2. *Due Process*

Due process requires a neutral and detached hearing body or officer. *Gagnon v. Scarpelli*, 411 U.S. 778, 786, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). The Texas Constitution requires no less. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim.App.2006). We neither doubt nor downplay the trial court's right and need to manage the trial and the courtroom. *Silva v. State*, 635 S.W.2d 775, 778 (Tex. App.-Corpus Christi 1982, pet. ref'd). Unlike the communications reviewed by the presiding judge during the recusal proceeding, these ex parte communications were not simply "[e]xpressions of impatience, dissatisfaction, annoyance, and even anger" toward Abdygapparova or her counsel. *See Liteky,* 510 U.S. at 555, 114 S.Ct. 1147. To the contrary, these comments were examples, inter alia, of the trial court providing guidance to the prosecutor on the presentation of his case and discussions regarding the trial court's initial ruling regarding Abdygapparova's ongoing request for an interpreter. As such, they extended beyond the realm of courtroom administration and etiquette, for

**18.** *See* 48A Tex. Prac., Tex. Lawyer & Jud. Ethics § 27.1 (2006–2007 ed.), Texas Practice Series TM, Handbook Of Texas Lawyer And Judicial Ethics: Attorney Tort Standards, Attorney Ethics Standards, Judicial Ethics Standards, Recusal and Disqualification of Judges Current through the 2006–2007 Update, Robert P. Schuwerk and Lillian B. Hardwick.

which the trial court has control, and became strong evidence of bias and partiality.

### 3. *Analysis*

■ Here, the trial judge knew or should have known that engaging in written communications with the State regarding potential jurors, defense counsel's voir dire questions and presentation of argument, all in the presence of potential jurors, was improper. TEX.CODE JUD. CONDUCT, Canon 3(B)(8), reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B. *See In re Davis*, 82 S.W.3d 140, 148 (Tex. Spec.Ct.Rev.2002) (holding that it is sufficient that the judge intended to engage in the conduct); *In re Barr*, 13 S.W.3d 525, 539 (Tex. Rev. Trib.1998, no appeal). We further acknowledge that it is the duty of all prosecutors, not to convict, "but to see that justice is done." *Tamminen*, 644 S.W.2d at 217. The secretive nature and content of the ex parte notes show a bias on the part of the trial court to favor the prosecution, even going so far as to make recommendations on the presentation of its case. As such, the trial judge became an advocate for the State, and an opponent of the defense, in direct conflict with her judicial requirement of absolute impartiality, precluding Abdygapparova from receiving a fair and impartial trial.

### B. Harm Analysis

■ No matter what evidence is against a defendant, the United States Constitution guarantees the defendant the right to an impartial judge. *See Blue v. State*, 41 S.W.3d 129, 138 (Tex.Crim.App. 2000) (Mansfield, J., concurring). The United States Supreme Court has repeatedly held that a violation of the right to an impartial judge is a structural error that defies harm analysis. *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Chapman v. Cali-*

*fornia*, 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *see also Cain v. State*, 947 S.W.2d 262, 264 (Tex.Crim.App.1997) (acknowledging structural errors recognized by *Arizona* ). The "presence on the bench of a judge who is not impartial" deprives a defendant of his basic protections and infects the entire trial process from beginning to end. *Arizona*, 499 U.S. at 309–10, 111 S.Ct. 1246; *see also Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The constitutional deprivation of an impartial judge affects the "framework within which the trial proceeds" and prevents the criminal trial from "reliably serv[ing] its function as a vehicle for determination of guilt or innocence." *Arizona*, 499 U.S. at 310, 111 S.Ct. 1246.

"[U]nder any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and [her] lightest word or intimation is received with deference, and may prove controlling." *Starr v. United States*, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 (1894). As the Texas Court of Criminal Appeals noted almost ninety years ago:

> [T]oo much caution cannot be exercised in the effort to avoid impressing the jury with the idea that the court entertains any impressions of the case which [she] wishes them to know.... To the jury the language and conduct of the trial court have a special and peculiar weight. The law contemplates that the trial judge shall maintain an attitude of impartiality throughout the trial. Jurors are prone to seize with alacrity upon any conduct or language of the trial judge which they may interpret as shedding light upon [her] view of the weight of the evidence, or the merits of the issues involved. The delicacy of the situation in which [she] is placed requires that

[she] be alert in [her] communications with the jury, not only to avoid impressing them with any view that [she] has, but to avoid in [her] manner and speech things that they may so interpret.

*Lagrone v. State,* 84 Tex.Crim. 609, 209 S.W. 411, 415 (1919).

This is an unfortunate case in which the trial judge failed to exercise appropriate caution and failed to maintain an attitude of impartiality throughout the trial. The trial judge's ex parte communications with the prosecutor suggest there was, at a minimum, a "chumminess" between the prosecutor and the trial court from which the jury could interpret that the trial court was "taking sides." Perhaps most alarming is the communication regarding Abdygapparova's ability to understand English which went to the heart of one of the trial court's rulings. Ex parte communications of this nature are evidence that the trial judge lacked the impartiality that due process requires.

Moreover, a complete review of the record reveals more than simple hostility by the trial court towards Abdygapparova and her defense counsel and demonstrates an ongoing, continuous bias or prejudice. From the initial motion for continuance filed by Abdygapparova's newly retained counsel, the trial judge made her displeasure known to the litigants. Her negative comments, which formed the basis of the initial motion to recuse, were insufficient to conclusively establish bias at that point in the trial but clearly evidenced a negative attitude toward Abdygapparova.[19] The admission of State's Exhibit # 181 (the Fetter letter) and the prosecutor's testimony before the jury, over continuous defense objection, regarding his recollection of Abdygapparova's statements made during plea negotiations provide some insight into these trial proceedings.[20] We are further unable to reconcile the stated concern for costs with the trial judge's refusal to allow Abdygapparova the use of an interpreter, who was sitting in a local hotel room at State's expense, waiting to be called by the trial court.

This is clearly a case in which the absence of an impartial trial judge on the bench infected the entire trial process, robbing Abdygapparova of her basic protections and undermining the ability of the criminal trial to reliably serve its function as a vehicle for the determination of guilt or innocence. *See Neder,* 527 U.S. at 8, 119 S.Ct. 1827; *Arizona,* 499 U.S. at 310, 111 S.Ct. 1246. Because "the right violated [in this case] was the right to an impartial judge, which is structural error, a harm analysis is not warranted." *Blue,* 41 S.W.3d at 139 (Mansfield, J., concurring).

## CONCLUSION

"No matter what the evidence was against [her], [Abdygapparova] had a right to an impartial judge." *Id.* at 138. Because the absence of an impartial judge on the bench infected the integrity of the trial process, the trial court's judgment is reversed, and the cause is remanded for a new trial.

---

**19.** While we recognize the sheer number of objections sustained or overruled by the trial court are insufficient to establish bias, in this case they provide some context for this trial. During the voir dire and trial, over two hundred objections were lodged by the State and the defense. While only one objection by the State was overruled, only four defense objections were sustained.

**20.** Appellant: I didn't say that.

State: Well, yes, you did.