**Modify and Affirmed as Modified and Opinion Filed this 15th day of August, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00831-CR

**CHRISTINA MARIE WILSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F11-27627-Q**

## MEMORANDUM OPINION

Before Justices FitzGerald, Francis, and Lewis
Opinion by Justice Francis

After a bench trial, Christina Marie Wilson was found guilty of injury to a child and was sentenced to five years in prison, probated for five years. In three issues, appellant complains about the sufficiency of the evidence, trial court bias, and the sentencing procedure. In a fourth issue, she seeks to modify the judgment to reflect there was no plea bargain agreement. We sustain the fourth issue but conclude the remaining three are without merit. We modify the trial court's judgment and affirm as modified.

K.B. is appellant's son. At the time of the incident, he was fourteen years old and lived with appellant, his maternal grandmother, and his two younger brothers. K.B. came home one evening, and appellant was intoxicated. K.B. said when his mother is drunk, she is "really aggressive" but "not violent" and "mostly cusses us." When appellant said she wanted to have

another drink, both he and his grandmother tried to talk her out of it. When appellant persisted, K.B.'s grandmother hid the bottle of rum, and K.B. hid appellant's car keys. Appellant left the house anyway. When she returned, she drank another drink and things "just went up a notch."

K.B. testified appellant grabbed him by the arms and tried to push him out of the house. K.B. removed his mother's hands from his body and pleaded with her to "please stop." His grandmother came into the room and stood between them. K.B. said he sat down on the couch, and appellant "launched" at him. K.B. said he pinned appellant down to restrain her, and appellant bit him on his chest. When he tried to get away from appellant, she tried to tackle him, and K.B. put her in a "choke hold" to calm her down. Appellant scratched his neck and grabbed his testicles and squeezed. K.B. ultimately was able to restrain appellant, and once she calmed down, he let her go and she went to her room.

K.B. said it "hurt really bad" when appellant scratched his neck. He said the confrontation started because he did not want appellant to drink. When the police arrived, he told them what happened, showed the officers his injuries, and his mother was arrested.

On cross-examination, he testified appellant scratched him and grabbed his testicles while trying to break free from the "choke hold." The trial court asked K.B. a series of questions about the choke hold, and he explained he had appellant in a "head lock" and was not "squeezing that hard." While in the head lock, K.B. said appellant continued talking and was not having trouble breathing. He demonstrated for the court how he held mother with his arm around the back of her neck, not the front. K.B. said his mother is "unpredictable" when she is drinking, which is why he thought he needed to restrain her. In the past, she had threatened him with an axe.

K.B.'s grandmother, Sherri Lynn Sleffel, testified her daughter has a drinking problem. When intoxicated, she said appellant is "verbally violent" but never remembers her actions later.

2

On the night of the incident, she said appellant was drunk. When K.B. came home, Sleffel told him not to confront appellant and to "just leave it alone." When appellant decided she wanted another drink, Sleffel hid the rum. Appellant became "very upset" and accused her of stealing. Appellant said she was going to get more alcohol, and K.B. begged his mother not to leave. Appellant left and when she returned, she had incense, not alcohol.

At first, appellant went to her room. But then she came out, yelling, "This is my house, I am the mom, you are not a grown man, I know you think you are, but you . . . are nothing but a little boy." Sleffel said K.B. felt emasculated and told Sleffel that if his mother came near him, he was "going to do something." When appellant approached K.B., he stood up with his arms by his side and his fists clinched. Appellant stepped in closer and "buck[ed] up" to K.B. in a "threatening manner," and Sleffel said K.B. grabbed her and put her in a choke hold. K.B. told Sleffel to call the police, and she did. Sleffel said K.B. was hollering for appellant to "go to sleep," and appellant was crying and flailing her arms and legs. Appellant then "just went limp," and after a few seconds, K.B. released her. Appellant got up from the floor and sat on the couch.

Sleffel said when the police arrived, they spoke only to K.B. She denied confirming K.B.'s version of what happened to the police and said she believed K.B. "exaggerated" the events to the police. She also testified she believed her daughter was having trouble breathing when K.B. had her in the choke hold. Sleffel believed K.B. was trying to "choke her to the point where she would pass out," but she did not believe he was trying to hurt appellant.

Officer Charles A. Allen Jr. testified he and his partner responded to the call. Appellant was intoxicated. Allen said he talked to K.B., saw the scratches on his neck and the bite mark on his chest, and contrary to Sleffel's testimony, said he confirmed K.B.'s story with Sleffel. Based

3

on K.B. and Sleffel's statements and the "actual marks" on K.B., he arrested appellant. Photographs of K.B.'s injuries were admitted into evidence.

Appellant testified she was defending herself from K.B. when she injured him. She admitted she was intoxicated at the time and remembered only "bits and pieces" of the altercation. According to appellant, after K.B. hid her keys, she walked to the corner store. Instead of buying alcohol as she intended, she bought incense. When she got home, she went into her room but was "festering" about K.B. telling her not to drink. So, she came out of her room to confront K.B. because he did not respect that she was the "boss." As a "scare tactic," she said she tried to throw him out of the house. As she was pushing him out, he turned and grabbed her, "whipped" her around, and put her in a choke hold. Appellant admitted biting and scratching K.B. and grabbing his testicles, but she said she did so only because she could not breathe. She believed the force she used was necessary to stop him from choking her.

In her first issue, she contends the evidence is legally insufficient to support her conviction because the evidence established self-defense. Specifically, she argues the evidence established K.B. placed her in a choke hold, forcing her to injure K.B. because she could not breathe.

In assessing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The trial court, as the trier of fact in a bench trial, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Goodwin v. State*, 376 S.W.3d 259, 264 (Tex. App.—Austin 2012, pet. ref'd). Therefore, we presume the court resolved any conflicting inferences and issues of credibility in favor of the judgment. *Id*. When a person challenges the

4

legal sufficiency of the evidence supporting a fact-finder's rejection of self-defense, we do not look "to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements" of the offense "beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

A person commits the offense of injury to a child if she "intentionally, [or] knowingly, . . . by act . . . causes to a child . . . bodily injury. *See* TEX. PENAL CODE ANN. § 22.04(a)(3) (West Supp. 2012). A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a) (West 2011).

The defendant has the initial burden of producing evidence to raise self-defense; the State then has the final burden of persuasion to disprove it. *Saxton*, 804 S.W.2d at 913–14. The State is not obligated to offer evidence refuting a claim of self-defense; rather, the State is required to prove its case beyond a reasonable doubt. *Id*. When a fact finder determines the defendant is guilty, there is an implicit finding against the defensive theory. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).

Here, the indictment alleged appellant intentionally and knowingly caused bodily injury to K.B., a child 14 years of age or younger, by striking and scratching K.B. with appellant's hand and fingernails, by biting K.B. with appellant's mouth, and by squeezing K.B.'s genitals with appellant's hand.

5

Appellant argues any injury she caused to K.B. was done "in an effort to ward off his attack of her." Although she admitted scratching and biting K.B. and grabbing his genitals, she claimed she did so because K.B. had her in a choke hold and she could not breathe. She argues the force she used was immediately necessary to stop K.B. from choking her and directs us to evidence she was having difficulty breathing.

The evidence in this case shows appellant was drunk and became angered when her son did not want her to continue drinking. Appellant attacked the child, and K.B. responded by first pinning her down (and she bit him) and then putting her in a head lock to restrain her (and she scratched him and squeezed his genitals). He explained he had his arm around the back of her neck, not the front, and said appellant was not having trouble breathing and continued to talk. Although appellant and her mother (K.B.'s grandmother) provided a different version of what happened during the fight, the trial court was entitled to believe K.B. After viewing all the evidence in the light most favorable to the prosecution, we conclude any rational trier of fact would have found the essential elements of injury to a child and the same rational trier of fact would have found against appellant on her self-defense claim. We overrule the first issue.

In her second issue, appellant complains her right to due process was violated by "the trial judge's clear and apparent bias against her during the trial, as evidenced by the judge's determination of guilt almost immediately after trial began." Appellant complains about the following specific instances:

(1) At the beginning of the proceedings, the prosecutor advised the judge the State had made a plea-bargain offer to reduce the offense to misdemeanor assault, and the judge responded, "Why are you reducing it to a misdemeanor assault?" (Appellant did not accept the offer.)

6

(2) As the prosecutor began her questioning of K.B. about the specific incident, the trial judge interjected and asked K.B., "Did your mother assault you, hit you, strike you . . . scratch you, bite you? Did she do that to you back in December?" K.B. responded, "She bit me and she scratched me, yeah." The judge replied, "Okay. All righty." The prosecutor then continued her questioning.

(3) During the defense's cross-examination of K.B., the trial judge intervened and asked specific questions about the choke hold and whether K.B. knew what a choke hold was. She had him demonstrate how he held his mother during the incident and asked whether she continued to talk while in the hold and whether she had difficulty breathing.

(4) When K.B. testified his mother previously threatened him with an axe, and the prosecutor asked what appellant was saying as she followed him with the axe, the trial judge interjected, "She wasn't - - she wasn't thinking that she needed to chop some wood right then and there?" K.B. responded, "Right" and the trial court directed the prosecutor to "[a]sk your next question."

(5) During recross-examination, defense asked K.B. if he was asking the judge to find appellant not guilty "because she was just trying to get you off her when she scratched you and bit you and . . . grabbed you; is that right?" The trial court interrupted and told defense counsel not to ask that question: "We're having a trial. Your client made a decision to have a trial, and we're having a trial. I don't care what he thinks. . . .It's not his decision to make."

(6) Defense counsel then returned to questions regarding the choke hold, and the trial court said, "No. I've already heard that question and answer a million times." A few questions later, defense counsel asked K.B. if he was "going to put her to sleep by just holding her under

7

your arm," and K.B. said he was not trying to put his mother to sleep. When defense counsel asked why he told her to go to sleep, the judge intervened:

> [TRIAL JUDGE]: You know what? This isn't helping your case any. You want to set up a self-defense claim because the child of a drunkard is trying to keep his mommy from driving drunk. This what I'm thinking now. Now I understand you're trying to impeach him, but he has answered these questions already. I didn't have her in a choke hold. I've seen his demonstration. It wasn't a choke hold. She could speak, breathe at the same time. I know you're trying to set up self-defense. I understand that, but these questions have already been asked and answered.

> [DEFEENSE COUNSEL]: I just wanted to be clear, Judge.

> [TRIAL JUDGE]: Okay. Oh, it's very clear to me what happened. It's very clear to me. And unless you have anything else to impeach him with, you know, I'll wait to hear your witnesses.

> [DEFENSE COUNSEL]: No more questions.

> [TRIAL JUDGE]: And if you want to - - if something is unclear and you want to call him back, then you're free to do so.

(7) When the prosecutor questioned appellant's mother, the trial judge interjected to ask a series of questions concerning K.B., his reputation for truthfulness, appellant's drinking habits, and K.B.'s relationship with his mother. Later, when the prosecutor cross-examined appellant, the judge asked a series of questions about appellant's actions that night and later asked other questions, which appellant characterizes on appeal as "badger[ing]."

(8) During the prosecutor's closing argument, the trial judge observed that the "person that's the least believable was the Defendant. She was so drunk." (This comment came after the prosecutor argued the grandmother was "trying to sugar-coat" appellant's actions, and the trial judge differed, saying "I just think people see different things. It was probably kind of crazy.")

(9) After finding appellant guilty and before hearing punishment evidence, the court said all witnesses could return to the courtroom, adding "since they were forced to be here, they might as well see what's going on."

8

(10) Finally, during appellant's punishment testimony, the judge asked if appellant knew there were photographs of K.B.'s injuries, and appellant said, "I knew after I got out, yeah." The trial court then asked, "Why would you make your own son come and testify against you? Why would you do that? Why would you put him through this trial?" Defense counsel then interjected that appellant knew she would lose her job if convicted and, after he spoke with K.B., he believed it was "clearly self-defense" and the decision to go to trial was "more my decision than hers[.]" After the trial court ascertained that appellant knew she "had the option to just take a misdemeanor" and "be on a misdemeanor probation," the trial court told appellant, "And you decided you didn't want to do that because you didn't want to lose your job and because you thought you were not guilty?" Appellant said she believed she acted in self-defense, adding she would never physically injure her child. The trial court responded, "But it - - you never stopped to think, well, you know, my brain was floating in alcohol; I probably don't remember very well what happened; maybe my son is being truthful? That - - that never occurred to you?" Appellant said she didn't know. The trial judge continued with several more questions about appellant's alcoholism.

Appellant argues the above instances demonstrate (1) the judge determined appellant's guilt "long before" hearing all of the evidence; (2) the judge's premature determination resulted in her "closing her eyes and ears to actual evidence; and (3) the judge's comments "reveal an excessive and unwarranted level of hostility toward a remorseful and recovering alcoholic with no prior felonies." We cannot agree.

The parties have a right to a fair trial. *Dockstader v. State*, 233 S.W.3d 98, 108 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). One of the most fundamental components of a fair

9

trial is a neutral and detached judge. *Id*. A judge should not act as an advocate or adversary for any party. *Id*.

When an appellant claims judicial bias, we review the record to see if it shows the judge's bias denied him due process of law. *Armstrong v. State*, No. 05-10-01245-CR, 2011 WL 6188608, at *5 (Tex. App.—Dallas Dec. 14, 2011, no pet.) (not designated for publication). The terms "bias" and "prejudice" do not encompass all unfavorable rulings towards an individual, but instead must "connote a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate, either because it is undeserved, or because is rests upon knowledge that the subject ought not to possess . . . or because it is excessive in degree." *Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd) (citing *Liteky v. United States*, 510 U.S. 540, 550 (1994)). Judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. *Dockstader,* 233 S.W.3d at 108. And, a "judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Garcia v. State*, 246 S.W.3d 121, 147 (Tex. App.—San Antonio 2007, pet. ref'd) (quoting *Liteky*, 510 U.S. at 556).

Having reviewed the entire record in this case, we cannot conclude it supports appellant's assertion that she was denied due process because of judicial bias. Initially, we note this was a bench trial, so there are no concerns that the judge in some way influenced a jury. The record shows the trial judge was more actively involved in questioning witnesses, but it appears more times than not she was managing the flow of the trial and did not want to hear redundant testimony or needlessly prolong the trial. That she identified the critical issue early on—whether appellant's conduct was justified—and focused on it does not reflect partiality on the judge's part

10

nor does the fact that she found K.B. to be a credible witness early on. While some of the trial judge's comments may well show she was critical or disapproving of appellant, "expressions of impatience, dissatisfaction, annoyance, and even anger" in the ordinary conduct of court administration does not establish bias. *See Liteky*, 510 U.S. at 555–56 (discussing bias in context of recusal).

In addition, appellant cites to places in the record where the trial judge "retorted," "sarcastically" asked a question, "badgered" appellant, or "blurted out" a comment. However, tone and demeanor are not apparent from a cold record. *Armstrong v. State*, No. 05-10-01245-CR, 2011 WL 6188608, at *6.

Finally, we note appellant relies on *Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd) to support her argument. In *Abdygapparova*, the trial court engaged in several instances of ex parte communications with the State, including passing notes during voir dire. 243 S.W.3d at 198, 206–07. In addition to the ex parte communications, the court of appeals concluded the record as a whole demonstrated a bias toward Abdygapparova, specifically noting the admission of damaging evidence that clearly should not have been admitted and its concern the trial court did not allow an interpreter. *Id*. at 199–204. Appellant argues that, as in *Abdygapparova,* the trial judge's actions here "infected the entire trial process, robbing [appellant] of her basic protections and undermining the ability of the criminal trial to reliably serve its function as a vehicle for the determination of guilt or innocence." We cannot agree. Nothing in this case approaches the bias demonstrated in *Abdygapparova.* The trial judge here was not exchanging ex parte communications with the State nor did she make recommendations to the State about the presentation of its case. *See id*. at 209. We overrule the second issue.

11

In her third issue, appellant contends the trial court erred in failing to pronounce her sentence and afford her the right of allocation. *See* TEX. CODE CRIM. PROC. ANN. art. 42.03, § 1(a) (West Supp. 2012) (stating sentence shall be pronounced in defendant's presence); TEX. CODE CRIM. PROC. ANN. art. 42.07 (West 2006) (stating trial court should ask defendant if there is any reason sentence should not be pronounced against him). The State responds that appellant waived any error by failing to object. We agree with the State.

At the conclusion of the evidence in the punishment phase, the trial court stated it was setting punishment at five years in prison, suspending imposition of the sentence, and placing appellant on probation for five years. The trial court ordered a CATS evaluation and advised appellant she had thirty days to file an appeal.

Appellant contends the trial court did not pronounce sentence in this case; it just assessed punishment. Further, she complains the trial court did not ask if there was any reason why sentence should not be pronounced, denying her the opportunity to plead for mercy. Appellant recognizes she failed to object to any error, but she asks this Court to consider here argument in the interest of justice. We decline her invitation.

Texas Rule of Appellate Procedure 33.1 requires a complaining party to make a timely, specific objection to preserve error for appellate review. *See* TEX. R. APP. P. 33.1. Because appellant failed to object that she was denied her right to the pronouncement of sentencing or her right to allocation, we conclude she has waived any error. *See Tenon v. State*, 563 S.W.2d 622, 623–24 (Tex. Crim. App. 1978) (holding appellant failed to preserve his argument regarding allocation by failing to object in trial court). We overrule appellant's third issue.

In her fourth issue, appellant asks the Court to reform the judgment to correctly reflect that there was no plea bargain agreement and she pleaded not guilty. This Court has the

12

authority to correct a judgment of the court below to make the record "speak the truth" when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd).

Here, the judgment states that the "Terms of the Plea Bargain" are "**5 YEARS TDC / PROBATED FOR 5 YEARS**" and that the "Plea to Offense" is "**GUILTY**." The reporter's record shows otherwise. Because we have the necessary information and documents to do so, we modify the trial court's judgment to reflect there was no plea bargain agreement and that appellant pleaded not guilty.

We affirm the judgment as modified.

      /Molly Francis/
      MOLLY FRANCIS
      JUSTICE

Do Not Publish
TEX. R. APP. P. 47
120831F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CHRISTINA MARIE WILSON, Appellant

No. 05-12-00831-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F11-27627-Q.
Opinion delivered by Justice Francis;
Justices FitzGerald and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect Not Guilty under "Plea to Offense" and None under "Terms of Plea Bargain."

As **MODIFIED,** the judgment is **AFFIRMED**.

Judgment entered this 15th day of August, 2013.

/Molly Francis/

MOLLY FRANCIS
JUSTICE

14