In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-12-00464-CV**
_____

**IN THE INTEREST OF A.K.M., J.D.M., AND D.M.M.**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. F-201,904-H**

**MEMORANDUM OPINION**

Appellant, the father of the minor children A.K.M., J.D.M., and D.M.M., appeals the trial court's modification order in a suit affecting the parent-child relationship and the denial of his motion to recuse the trial judge. Appellant raises ten issues for our consideration. We affirm the trial court's order denying the motion to recuse, and we affirm the trial court's modification order in part and reverse and remand the order in part for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

Appellant M. and the children's mother, appellee W.,[1] divorced on October 27, 2008. In 2010, M. filed a petition to modify the parent-child relationship. In his petition, M. sought appointment as sole managing conservator of the children or, alternatively, appointment as joint managing conservator with the right to determine the children's primary residence, as well as child support from W. M. contended that W. had attempted to alienate him from the children, parented the children inappropriately, failed to provide proper medical care for the children, failed to co-parent the children with him, and that W. suffered from Munchausen syndrome by proxy, "otherwise known as a histrionic personality disorder." According to M., W. had falsely insisted to mental health professionals and school officials that J.D.M. and D.M.M. suffered from Asperger's syndrome. The judge of the 279th District Court, where the divorce action was litigated, eventually recused himself from the case, and the case was reassigned to the 252nd District Court, although the appellate record does not reflect the precise means by which the reassignment was accomplished.

W. filed a counter-petition, in which she sought appointment as sole managing conservator of the children and contended that "[t]he parties have been

---

[1]To protect the children's privacy, we will refer to the appellant as "M." and to the appellee as "W."

unable to communicate in a manner conducive to joint managing conservatorship." W. asserted that M. had exposed the children to hostility and alienation against her by filing "constant and continuing litigation[,]" contacting law enforcement officers despite the lack of an emergency, having trespass and cease and desist warnings issued that forbade W. from his residence, "mounting a letter[-]writing campaign to medical and psychological providers for the children accusing her of harming the children[,]" sending private emails between the parties to other individuals, and causing a complaint to be made against W. with the Texas Department of Family and Protective Services ("CPS"). W. further alleged that M. had demonstrated an inability to maintain a positive relationship with her "that is conducive to joint managing conservatorship," exposed the children to the overnight stays of his sexual partners, and "exposed the children to unknown and unchecked individuals during the operation of another's business" in his residence. W. requested that M. exercise possession and access pursuant to the standard possession order "if and only if recommended by the court[-]appointed mental health professionals[.]"

The custody case was tried to the bench in January 2012. According to M., the trial judge sent M. and W. to Dr. Michelle Douget, who advised the trial court that M. and W. should cooperate and agree regarding the treatment of the children

3

and recommended that M. and W. have psychological testing for personality traits, as well as participate in ongoing therapy. M. testified that Douget found he did not suffer from any mental abnormalities.

Clinical psychologist Dr. Dan Roberts testified the trial judge asked him to evaluate M. and W., and that he interviewed both M. and W. for several hours and asked them to complete two personality inventories. Roberts also testified that he reviewed a report from Dr. Timothy Bohan, who the trial court had previously appointed as an expert to evaluate the children.[2] Roberts also testified that he talked to all three of the children, spoke to several people about M. and W., and reviewed the children's medical, pharmacy, counseling, school, and other records. Roberts also spoke to two of the children's teachers.

Roberts recommended that the trial court consider increasing M.'s possession time with the children, and he explained that the two older children wanted more time with their father. Roberts also recommended that the court consider appointing a parenting facilitator rather than a parenting coordinator because a facilitator is permitted to testify concerning the parents' progress, which

---

[2]Although the trial court stated that it did not intend to consider any of the opinions Bohan offered with respect to M. or W., the trial court cited Bohan's report as evidence in support of its findings of fact. In the report, Bohan stated that he found some of M.'s responses during the evaluation troubling and indicative of unusual thought processes.

would allow the case to proceed and expose the children to less conflict. In addition, Roberts testified that prior to the divorce, M. had suffered a bout of major depression, during which he was delusional. According to Roberts, M. is capable of making medical and educational decisions for the children "up to a point[,]" but Roberts explained, "I'm not certain that that's a capacity or a willingness that is stable based on his history." Roberts stated that M. "should have a voice" in making such decisions.

In Roberts's psychological assessment of M., which was based upon his examination of M. on November 16, 2011, and was introduced into evidence, he concluded that M. had no "significant current problems" with depression, anxiety, psychosis, stress management, or anger management, and that M. was currently participating in counseling to help him manage stress. Roberts later noted in his assessment that M. was "experiencing symptoms of anxiety and depression associated with the aftermath of his divorce and his concern about the children's welfare[,]" and that M. had "obsessive tendencies, competitiveness, unusual ideas, and a degree of inflexibility under stressful conditions." Roberts's assessment concluded that "[o]n the whole [M.] appears to be a capable and concerned parent."

At the conclusion of the custody trial, the trial court issued temporary orders awarding W. the exclusive right to consent to medical, dental, psychiatric, and psychological treatment for the children, as well as the exclusive right to make decisions concerning their educational needs, and ordered that M. "will not have any contact with any teacher or medical provider or evaluator." In a second order, the trial court ordered that M. and W. would remain joint managing conservators of the children, a behavior plan should be developed for D.M.M. through the public school district, any appropriate therapy for D.M.M. shall begin immediately, the parties shall not publicly discuss the children's medical issues except with medical providers or teachers, and the parties shall not discuss medical issues with the children. The trial court further ordered that M. would have possession of the children pursuant to the expanded standard possession order "as set out in the Texas Family Code[,]" A.K.M. and J.D.M. shall have one extra overnight with M. if they so choose, the parties shall utilize an internet calendaring system with the amicus attorney for the children's extracurricular activities, and both M. and W. shall participate separately in therapy. The trial court set the cause for final hearing on June 4, 2012.

In April 2012, M. filed an emergency motion for protection and appointment of an attorney ad litem, in which he alleged that A.K.M. had made an

outcry of sexual abuse against W., and the trial court conducted an emergency hearing on the motion on April 10 and 11, 2012. At the emergency hearing, M. testified that he had been exercising visitation with the children since the trial court's temporary orders, and he described A.K.M as "in a state of full[-] scale meltdown" and indicated that A.K.M.'s grades were poor and she was very angry with her mother and grandmother. According to M., A.K.M. indicated that she wanted to live with her father, and "she's afraid to go back to her mother's." M. testified that J.D.M. was also angry that since the temporary orders were entered, M. had not been participating in his schooling, and he also testified that D.M.M. was regressing with potty training.

M. explained that A.K.M.'s condition had deteriorated significantly during the last month, and she had been "near hysterical[.]" According to M., A.K.M. made an outcry of sexual abuse against W. to M.'s girlfriend B., and A.K.M. then continued her outcry to M. M. testified that he had not suspected any abuse and was shocked by it. M. explained that he took A.K.M. to the police department, and A.K.M. wrote a statement. M. subsequently received a call from Detective Mark Hoge, who asked M. to bring B. and A.K.M. to the police station. M. testified that A.K.M. was interviewed for about two and a half hours, and the investigating officer also interviewed M. and B. According to M., both Detective Hoge and

Sarah Miller from the Lufkin CPS office told M. that CPS would arrive at noon to do a Priority One removal and have the children professionally interviewed. M. testified that he wanted the trial court to make him "sole managing conservator with all powers" during the pendency of the investigation, and that W. have no visitation during that time.

The trial court asked the amicus attorney to contact Detective Hoge and Miller. The trial judge personally questioned both Hoge and Miller on the record after they were sworn, and both Hoge and Miller denied telling M. that CPS intended to remove the children. The trial judge then announced his intention to interview A.K.M. with a court reporter present, and the record reflects that the trial judge extensively interviewed A.K.M., who was thirteen years old at the time, in chambers. The reporter's record of the interview encompasses seventy-nine pages. The time stamps in the record of the hearing, although less than a model of clarity, reflect that the interview apparently began at 1:18 p.m. and continued until 2:44 p.m.

When M. returned to the stand, W.'s counsel asked the court to admonish M. of "his Fifth Amendment rights for perjury." W.'s counsel asked M. if he testified that CPS and the police told him that the children were going to be removed, and M. testified, "[o]bviously I misspoke or misunderstood" and was "in error." M.

testified that he was on medication for weight loss and acid reflux, but was not under the influence of drugs or alcohol. M. testified that he thought he recalled Detective Hoge telling him the case would be treated as a Priority One, but that his memory was apparently incorrect, and he attributed his faulty recollection to the fear he had experienced since A.K.M.'s outcry.

W.'s counsel asked M. whether he had discussed the case with K., a blogger who M. (an attorney) represents, and M. responded that he had done so, but not in detail, and M. indicated that he feared K.'s issues with the trial judge would be taken out on M. M. testified that he had told A.K.M. to tell the truth when she spoke to the trial judge. W.'s counsel asked M. whether he had anything to do with "reports in various newspapers and news media . . . about what a bad judge . . . Layne Walker is[,]" and M. denied having any involvement with those reports or telling his children that the judge was bad, crazy, or mean. M. testified that he showed the children one of the trial court's temporary orders because they were upset because he was not attending parent-teacher conferences. M. denied asking a local reporter to publish a story concerning W.'s alleged romantic relationship with a political figure, but M. admitted that he had discussed the alleged relationship with the reporter. M. testified that he took A.K.M. on an overnight trip to "have some fun, to put it out of her mind" after A.K.M. made the outcry. M. denied

9

scheduling the trip as a reward. M. also explained that he "was concerned if [the outcry] was fabrication that [A.K.M.] needed substantial help." M. testified that he had repeatedly asked A.K.M. whether she was sure her allegations were true, and told her not to say things just because she wanted to live with him. At the conclusion of the day's testimony, the trial judge also announced that the record of his interview with A.K.M. was sealed and "nobody will ask for a copy of it because you are not going to get it."

M. was not present when the proceedings resumed the next morning. M.'s counsel objected to going forward without M. but did not otherwise object to the amicus attorney testifying. The amicus attorney, Raquel West, testified that she had served as an amicus attorney in the case for approximately ten months, and she had interacted with the children, M., and W. on many occasions.

According to West, M. called her because he believed he could not attend one of J.D.M.'s school activities, and West advised M. "that was not the order or the spirit of the order of the Court[,]" and she testified that she had also spoken with the trial judge about the issue, and West advised M. that the only restriction he had was "contacting teachers and medical providers." West testified that M. indicated he understood, and M. attended the activity. West explained that she heard M.'s testimony that he believed he could not be involved with the children's

schooling, including reading, proofing, or approving their homework, and West testified that she found M.'s testimony incredible and "quite disturbing." According to West, J.D.M. and A.K.M. had both been exercising their right to have an additional day with their father, and A.K.M. "is doing really poorly in school in several subjects, not just one."

West testified that she heard M. say that he was not helping or following through with checking whether A.K.M. had homework, and West stated, "I truly believe he was potentially trying to sabotage her school and her grades in an effort to show that because [W.] got the educational decision-making that he could . . . show . . . how poorly [A.K.M.] has done." West also explained that M.'s testimony about the children being upset about the trial court's ruling confused her "because they actually got what they wanted and that was an extra day with their dad." West opined that the children should not have seen a change in their daily lives, and that it was inappropriate for M. to leave a court order out for them to read.

West testified, "I find . . . that these children are damaged because of him. I think they are continuing to be damaged even more so since the order. He is taking out his frustrations in a very conniving way on these children." In addition, West opined that M. has permanently changed the direction of A.K.M.'s life, and she recommended that A.K.M. have intensive psychotherapy. West testified that

11

A.K.M. has been "brainwashed to some extent" and that M. taught her "to be manipulative to get what you want." West also opined that most of A.K.M.'s outcry was false and was promoted by M. West opined that with respect to A.K.M., "any access to her father needs to be extremely limited and probably supervised." West further opined that all of the children could deteriorate under the circumstances. West testified that A.K.M. is willing to sacrifice herself to protect her father.

M. arrived during cross-examination of West. When M. retook the stand for additional cross-examination, he explained that he passed out on the stand the previous day and did not have full memory of everything that occurred. M. explained that taking weight loss medication, only eating a breakfast bar all day, and dehydration contributed to an anxiety attack. M. denied telling A.K.M. "to do this[;]" *i.e.*, make an outcry. M. testified, "I always thought from the beginning, 2008, that there would be a relentless attempt to terminate my rights." When asked whether he contacted K. after leaving the courtroom, M. responded that K. visited him at the hospital, and that he spoke with K. that morning and told him he was scared. M. testified that he did not believe he committed perjury and did not intentionally lie. When asked whether he should have control of the children when

he is under such distress that he was not in control of his faculties, M. testified, "As I sit here right now, no, I'm too upset."

At the conclusion of the hearing, the trial court stated as follows:

> I just want an entire copy of this transcript turned over to the Jefferson County District Attorney's office and I want Mr. Maness to have his staff or whoever he chooses to review this for perjury and/or aggravated perjury. I do claim to be an expert in that area, but I am not going to make that decision. If Mr. Maness's Grand Jury is not willing to take a look at it[,] I will be willing to convene a special Grand Jury for the sole purpose of taking a look at this.
> . . . I am going to order [M.] to cease and desist from relying on hearsay in his life.
>
> . . . [M.] will have no contact with these children of any nature whatsoever until further order of the Court.

On April 11, 2012, the trial court signed a temporary order that removed the children from both M. and W., forbade M. and W. from having contact with the children, and temporarily appointed the children's maternal grandmother as their sole managing conservator. On April 19, 2012, the trial court signed an order denying M.'s motion for protective order and appointment of an attorney ad litem. In that order, the trial court found that M.'s "acts and manipulations . . . have placed all of the children at immediate and significant risk of danger to their physical and emotional welfare and caused the children to be in immediate danger in [his presence]." The court further found that M. had not acted in the children's best interest, and that the children's present circumstances would significantly

13

impair their physical health and emotional welfare. The trial court removed all three children from M.'s custody and presence "for the children's own protection." Additionally, the order provided that the provisions in the temporary order of April 10 with regard to W. would remain "until confirmation has been received by this Court that [CPS] ha[s] ruled out the allegations of abuse against [W.]." Furthermore, the trial court ordered that upon receipt of such confirmation, W. "shall have unlimited and unrestricted possession and access of the children subject of this suit."

On April 18, 2012, the trial court held a hearing on W.'s motion to enter orders. The hearing was scheduled because M. had filed a petition for writ of mandamus with this Court after the hearing on the emergency motion, and the purpose of the hearing apparently was to provide this Court with an order to review in the mandamus proceeding. M. was not present at the hearing. At the hearing, M.'s counsel acknowledged that the amicus had sent a letter stating that CPS and the police did not intend to proceed with any allegations of abuse against W. The trial judge stated,

> I want to make sure that the record is clear as well. . . . Correspondence that has been made or phone calls that have been made has been from the investigating authorities to the Court. I have not been involved in constant conversation. . . . [A]t no time has the Court involved itself in the investigation.

14

At one point during the proceedings, when W.'s counsel and the trial judge were questioning M.'s counsel about the basis for his objections to the proposed order, the following exchange occurred between M.'s counsel, W.'s counsel, and the trial judge:

> [W.'s counsel]:    Did you hear . . . [M.]'s response to the question when I asked him if he was capable of taking care of the children and on the second day he said he wasn't capable of taking care of himself right now and no, he wasn't capable of taking care of the children?
>
> [M.'s counsel]:    I heard him say at this point at this time, which is [with] reference to his present condition.
>
> [W.'s counsel]:    So, now, you are making the objection to the Court that there was no evidence upon which the Judge can base the ruling that the children shouldn't be around [M.] for their own protection?
>
> [M.'s counsel]:    Because he was not capable of taking care of the children at that point is not grounds for taking away the children permanently from him, which this paragraph does.
>
> THE COURT:    Can I just ask for my protection, is there anything now in the record that suggests otherwise?
>
> [M.'s counsel]:    That the children should not be taken away?
>
> THE COURT:    The only evidence that I have before me is [M.] saying that he is not in a position to take care of them. [M.] has voluntarily absen[t]ed himself from the proceeding today. . . . Is there anything in the record from the day he testified to that that has changed?

M.'s counsel objected "to being put under examination."

15

W.'s counsel's examination of M.'s counsel continued on for dozens of pages of the reporter's record, and the trial judge also made comments to M.'s counsel and questioned M.'s counsel during the examination. The trial judge also commented that he believed M. made a false report of abuse and "spent an extended period of time brainwashing [A.K.M.] and spending days rewarding her for her conduct. . . . [U]nder section 153.013 I find that [M.] definitely made a false report of abuse. He encouraged it. He assisted it."

In June 2012, M. filed a motion to recuse the trial judge. M. asserted in the motion that the trial judge's impartiality "may reasonably be questioned." *See* Tex. R. Civ. P. 18b(b)(1). Specifically, M. contended that after the custody trial in January 2012, K. had published articles which were critical of the trial judge and had filed a complaint against the trial judge with the State Commission on Judicial Conduct. M. complained in the motion to recuse that the trial court ordered that neither M. nor W. have access to the children, "even though there was no complaint filed against [M.] and no affirmative relief asking that [M.] be denied access to the children." In addition, M. complained that the trial judge had *ex parte* communications, and he pointed to, among other things, the trial court's comment at the April 18, 2012, hearing that "It's been reported to me that since [A.K.M.] has been returned that she's making great strides. Her grades are back in order.

16

Everything is in good shape." M. also complained of the trial judge's sealing of the record of his interview with A.K.M., as well as the judge permitting W.'s counsel to call the amicus attorney as a witness to testify about "highly contested issues." In addition, M. alleged that although no complaint had been filed against M. and no affirmative relief had been requested concerning denying M. access to the children, the trial judge *sua sponte* ordered that neither W. nor M. have access to the children.

On June 26, 2012, Judge Olen Underwood conducted a hearing on M.'s motion to recuse. M.'s counsel testified that the trial judge summoned an attorney for the City of Beaumont to bring the investigative report concerning A.K.M.'s outcry to chambers, but never made the file part of the record. In addition, M.'s counsel testified that during the first day of the hearing, the trial judge commented to Miller and Hoge about the chance they had to "visit in [c]hambers," and only the trial judge questioned Miller and Hoge; the attorneys were not permitted to do so. M.'s counsel also testified that communications occurred between the trial judge, Hoge, and Miller on the second day of trial "either by way of telephone or text." According to M.'s counsel, the trial judge also received a telephone call from W.'s mother, and the Court invited the parties to listen to his side of the conversation, but the parties could not hear what W.'s mother was saying.

M.'s counsel also testified concerning the trial judge's statements that he intended to refer the matter to the District Attorney's office to determine whether M. had committed perjury or aggravated perjury and that he would convene his own special grand jury if the District Attorney's office declined to investigate M. According to counsel, no party had testified that M. had encouraged A.K.M. to make false allegations of sexual abuse against W., nor was there any documentary evidence so indicating.

M.'s counsel testified that at the April 18 hearing on entry of orders, he was on the stand for approximately three hours, and both the trial judge and opposing counsel "aggressively questioned" him concerning a petition for writ of mandamus he had filed. M.'s counsel testified that a "pervasive bias . . . occurred in that hearing and questioning of me and to the point of insulting me, insulting my client, stating that getting the truth out of me was as difficult as extracting a molar without Novocaine. On numerous occasions saying that [M.] is not capable of telling the truth."

M.'s counsel also testified that the trial judge "repeatedly approached [A.K.M.] trying to get her to recant her testimony" during the in-chambers interview, and he explained that even after opposing counsel pointed out that pursuant to statute, an in-chambers interview of the child shall be made a part of

the record, the trial judge still declined to provide the transcript of the interview and instead sealed it. Counsel testified that A.K.M. never recanted her statements during the April interview.

K. testified that he owns a political consulting group that publishes an internet periodical. When M.'s counsel asked him whether he had published anything on the internet that was critical of the trial judge, W.'s counsel objected on the grounds of relevancy, and Judge Underwood sustained the objection. M.'s counsel asked K. whether he had filed a complaint against the trial judge with the Judicial Commission, and Judge Underwood again sustained W.'s counsel's relevancy objection despite M.'s counsel's argument that "animosity between [K.] and . . . Judge Layne Walker has created a problem in our case because the Judge perceives [M.] as being a close friend of [K.]."

Miller testified that she had a conversation with the trial judge to which she and the trial judge were the only participants. According to Miller, the trial judge asked her if she was investigating the case, and then she answered the same question again when he posed it to her under oath in the courtroom. M.'s counsel rested at the conclusion of Miller's testimony. Judge Underwood denied the motion to recuse.

On September 14, 2012, W. filed a "request for additional relief in light of evidence since the date of trial and brief in support[.]" In her request, W. discussed M.'s testimony at the emergency hearing concerning A.K.M.'s outcry and his testimony that CPS had told him a removal of the children was imminent, as well as the CPS caseworker's testimony that CPS had not told M. that a removal was imminent. W. also pleaded that CPS had ruled out the alleged abuse by W., and she contended that "evidence was introduced that would lead a reasonable person to believe [M.] had encouraged and facilitated [A.K.M.] into making allegations . . . of sexual abuse" against W.

W. pointed the trial court to this Court's opinion in the mandamus proceeding, in which we held that "the trial court heard evidence from which the court could reasonably conclude that the order [changing custody] was necessary to prevent significant impairment of the children's physical health and emotional development."[3] *In re M.*, No. 09-12-00179-CV, 2012 WL 1808236, at *3 (Tex. App.—Beaumont May 17, 2012, orig. proceeding) (mem. op.). W. asserted that the trial court "should recognize a need for continued emotional healing for these children and need for a progressive, gradual return of an aggressively healed and

---

[3]The order before this Court in the mandamus proceeding was the trial court's initial order that provided neither parent could have contact with the children, not the order from which M. now appeals.

20

healthy father into their lives and minds." W. requested "the Court to consider the children, who . . . experienced this hostile drama . . . for at least the past *five* years of their young lives. Five years of rancid feelings carried in the heart and mind of [M.] exuding from his demeanor and his actions throughout the time spent with his children. This recognized hatred has worked to harm the children. . . ." According to W., the evidence adduced in the case had rebutted the presumption that the standard possession order is in the children's best interest, and she sought an order developing a transitory period leading to M. again having possession and access to the children after therapists determine that possession and access would be appropriate.

On September 18, 2012, the trial judge conducted a "Final Orders" hearing. M. was not present at the hearing. M.'s counsel argued that with respect to contested matters, an amicus attorney is not permitted to testify pursuant to section 107.007 of the Family Code.[4] *See* Tex. Fam. Code Ann. § 107.007(a)(4) (West 2008). The trial court denied M.'s motion to remove the amicus. The trial court then permitted W.'s counsel and the amicus to introduce evidence concerning the amount of W.'s attorney's fees and the amicus's fees.[5] On the same date, the trial

---

[4]M. had filed a motion to remove the amicus attorney.

court re-interviewed A.K.M. During the interview, the trial judge told A.K.M. that the amicus "told me you wanted to tell me something." A.K.M. then said that none of her previous outcry was true. A.K.M. told the judge that M. and B. had told her to make the allegations. When the trial judge asked A.K.M. if she wanted to visit her father, she said, "No. I couldn't. . . . He scares me. I don't like him. He is mean, and he lied to me." A.K.M. also told the trial judge that she did not want to see B., and she described B. as "evil."

At the conclusion of the hearing, the trial judge signed an order in the modification proceeding. In its eighteen-page order, the trial judge found that the material allegations in M.'s suit to modify are untrue and brought frivolously and for the purpose of harassment against W., denied M.'s requested modification, and appointed W. sole managing conservator and M. possessory conservator of the children. The trial court found that M. made a false report of child abuse against W., and that it is in the best interest of the children to limit M.'s rights as possessory conservator. Specifically, the trial court found that the standard possession order is not in the best interest of the children and determined that good cause exists "to order that [M.] be temporarily denied access during a period of

[5]Prior to the hearing, W.'s counsel had filed a motion that sought, among other things, the right to introduce supplemental evidence on attorney's fees concerning "multiple legal proceedings ancillary to the underlying modifications heard at trial in January 2012[.]"

therapeutic intervention leading toward restricted possession and access based on extreme circumstances found regarding the past behavior of [M.], the circumstances of the children, and the physical, medical, educational, and emotional needs of the children."

The trial judge appointed a therapist "to develop a transitory program leading to unsupervised possession and access of the children by [M.]" by November 1, 2012. The trial court ordered M. to receive therapy from a licensed mental health care professional, and required M.'s therapist to communicate with the court-appointed therapist and to "be guided by the direction of the court-appointed therapist in the areas of counseling and therapy for [M.]"  In addition, the trial court's order required the children to continue treatment with their current mental health care professionals, and ordered the court-appointed therapist to communicate with the children's therapists concerning the transitory program.

Under the terms of the order, the court-appointed therapist, M.'s therapist, and the children's therapists were to submit reports to the court and to the parties stating why the modified standard possession order contained within the order should or should not be instituted. These reports were to be submitted no later than sixty days before the date the modified standard order should begin. The order provided that the modified standard possession order would become effective

"immediately upon the completion of the transitory program and approval of the Court as provided above" and required that all periods of possession by M. shall be supervised at the court-appointed therapist's discretion for the first six months the modified standard possession order is exercised. The order also required M. to pay a civil penalty of $500 for making a false report of child abuse. *See* Tex. Fam. Code Ann. § 153.013(c) (West 2008). Finally, the trial court's order awarded W. attorney's fees in the amount of $241,417.59 and ordered M. to transfer exclusive control of the children's 529 savings accounts, which M. had established, to W.

M. filed a motion for new trial. Subsequently, the parties learned that the case had been reassigned to Judge Douglas Warne. Judge Warne conducted a hearing on the motion for new trial on November 19, 2012. At the hearing, M. produced letters from three therapists, each of whom had declined to serve as the court-appointed therapist under the September 2012 order. Judge Warne denied the motion for new trial.

On November 29, 2012, Judge Warne signed a "reformed" order, which changed the court-appointed therapist to Dr. Lawrence Abrams but kept in place the provisions from the September order regarding the transitory therapeutic period and forbidding M. from having any contact with the children. In January 2013, Judge Warne filed findings of facts and conclusions of law, in which he made the

24

following findings of fact, among others: (1) M. had attempted to permanently alienate the children from W., publicly disparaged W., placed his sons' health, education, and development at risk, and "repeatedly demonstrated bizarre and troubled behavior in the presence of the Court[;]" (2) it is in the children's best interest that M. "be temporarily denied access to the children so that he may seek his own therapeutic treatment/intervention leading to restricted possession and access of the children[;]" (3) unrestricted access to the children by M. would endanger their physical or emotional welfare; (4) "[e]xtreme circumstances exist sufficient to deny [M.] possession and access of the children until a licensed mental health professional appointed by the Court determines that it is in the best interests of the children to have restricted possession and access[;]" and (5) the 529 funds "are the property of the children" so W., as sole managing conservator, should have "sole unrestricted management and control of said funds." In its conclusions of law, the trial court determined that appointing M. as a joint managing conservator would significantly impair the children's physical health or emotional development, and limiting M.'s rights, duties, and access to the children is in the children's best interest.

W. filed a motion for judgment *nunc pro tunc* and a brief in support. W. contended that while the judgment awarded attorney's fees to her, "the order for

25

[M.] to actually pay the award appears to have been inadvertently omitted." According to W., the requested change was clerical rather than judicial, since the trial court stated at the September 2012 hearing that attorney's fees would be taxed against M. The trial court granted W.'s motion for judgment *nunc pro tunc* and ordered W. to submit a *nunc pro tunc* judgment that changed only the heading on page one and the judgment language on page seventeen. The trial judge subsequently signed a judgment *nunc pro tunc*, which contained language explicitly ordering M. to pay W. attorney's fees in the amount of $241,417.59.

On February 6, 2013, Dr. Abrams filed the required report with the trial judge by letter. In the report, Abrams recommended a plan leading to resumption of contact between M. and the children, and concluding that if M. adhered to the requirements of the plan and was able to re-establish relationships with the children, "the court might want to consider going to conventional visitation when enough time has passed to reassure the court of the father's stability." It is unclear from the record why no action has apparently been taken to begin Abrams's plan of reunification. W. contends in her brief that M. "has made NO attempt at proving his ability to act in the best interest of the children, and therefore have access to the children, by simply scheduling an appointment with the children's counselors to

begin the plan of reunification." She cites to nothing in the appellate record that verifies this assertion.

## ISSUE ONE

In his first issue, M. argues that Judge Underwood abused his discretion by denying the motion to recuse Judge Walker due to Judge Walker's alleged "extra-judicial bias and pervasive antagonism" toward M. We review an order denying a motion to recuse for abuse of discretion. *In re M.C.M.*, 57 S.W.3d 27, 33 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

A judge must recuse himself in any proceeding in which his impartiality might reasonably be questioned or he has a personal bias or prejudice regarding the subject matter or a party. Tex. R. Civ. P. 18b(b)(1), (2). A judge is presumed to be qualified until the contrary is shown. *Sparkman v. Peoples Nat'l Bank of Tyler*, 553 S.W.2d 680, 681 (Tex. App.—Waco 1977, writ ref'd n.r.e.). Recusal based upon an allegation of bias "is appropriate *only if* the movant provides sufficient evidence to establish that a reasonable person, knowing all the circumstances involved, would harbor doubts as to the impartiality of the judge." *Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion[,]" and opinions the judge forms during a trial do not necessitate recusal "unless they

27

display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id*. Expressions of impatience, dissatisfaction, annoyance, and anger do not establish bias or partiality when those expressions arise from events that occurred during trial. *Id*. at 555-56; *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001).

In his appellate brief, M. complains of Judge Underwood's exclusion of K.'s testimony during the recusal hearing and Judge Walker's "high degree of antagonism" against M. "To preserve error concerning the exclusion of evidence, the complaining party must actually offer the evidence and secure an adverse ruling from the court." *Perez v. Lopez*, 74 S.W.3d 60, 66 (Tex. App.—El Paso 2002, no pet.). With respect to the exclusion of certain testimony from K., the record reflects that although M.'s counsel argued to the court concerning the substance of the desired testimony and the reasons counsel believed the testimony was relevant, M.'s counsel did not make an offer of proof through K. *See id*. Because counsel did not make an offer of proof, M. has failed to preserve the issue for review. *See* Tex. R. Evid. 103(a)(2); Tex. R. App. P. 33.1(a)(1)(B); *Weng*

28

*Enters., Inc. v. Embassy World Travel, Inc.,* 837 S.W.2d 217, 221 (Tex. App.—Houston [1st Dist.] 1992, no writ).

Undoubtedly, the trial judge frequently and extensively displayed anger, frustration, annoyance, and dissatisfaction with M. and his attorney, as well as skepticism and disbelief about M.'s testimony, during the course of the proceedings. The record of the April 2012 emergency hearing indicates that the trial judge initially became angry with M. and skeptical of his testimony when Hoge and Miller contradicted M.'s testimony, and it was at that point when the trial judge announced his intention to interview A.K.M. in chambers. By the time the trial judge called Hoge and Miller to testify, he had heard M. testify and observed M.'s demeanor on the stand for almost three hours. It is clear from the manner in which the trial judge conducted the interview with A.K.M. that the trial court disbelieved M.'s testimony concerning A.K.M.'s outcry. However, the record does not demonstrate that the trial judge's disbelief of M.'s testimony and his subsequent displays of anger were derived from an extrajudicial source. Rather, the record demonstrates that the trial judge's anger, annoyance, frustration, and dissatisfaction likely derived from his belief that M. had given false testimony. While the trial judge undoubtedly displayed anger and a desire to see M. criminally investigated, his conduct does not demonstrate such a pervasive extrajudicial bias

29

or antagonism that required recusal. *See* Tex. R. Civ. P. 18b(b)(1), (2); *Liteky*, 510 U.S. at 555; *Abdygapparova*, 243 S.W.3d at 198; *Francis*, 46 S.W.3d at 240. Accordingly, Judge Underwood did not abuse his discretion by denying M.'s motion to recuse. We overrule issue one.

## ISSUE FIVE

In his fifth issue, M. argues the trial court erred by permitting W.'s counsel to call the amicus attorney to testify regarding contested issues of fact. *See* Tex. Fam. Code Ann. § 107.007 (West 2008). As discussed above, M.'s counsel did not object during the emergency hearing to the amicus attorney testifying. Therefore, M. failed to preserve the issue for appeal. *See Conn v. Rhodes*, No. 2-08-420-CV, 2009 WL 2579577, at *5 (Tex. App.—Fort Worth Aug. 20, 2009, no pet.) (mem. op.) (Failure to object at trial to the admission of an amicus attorney's report or testimony waives the complaint on appeal.); *see also* Tex. R. App. P. 33.1(a); *In re J.K.F.*, 345 S.W.3d 706, 717 (Tex. App.—Dallas 2011, no pet.). Accordingly, we overrule issue five.

## ISSUE SIX

In issue six, M. contends the trial court abused its discretion by ordering M. to transfer control of the children's 529 college plans to W. and to pay attorney's fees in the amount of $241,417.59. With respect to the 529 accounts, M. argues

that no pleadings or evidence support the order. With respect to the attorney's fees, M. apparently asserts that no pleadings support an award of any fees other than those incurred at the January trial, and he maintains that the trial judge lacked authority to award fees for the mandamus proceeding or the recusal proceeding.

In her counter-petition, W. pleaded for "reasonable attorney's fees . . . through trial and appeal[;]" therefore, M.'s contention that no pleadings support an award of attorney's fees is inaccurate. Section 106.002 of the Family Code provides, "In a suit under this title, the court may render judgment for reasonable attorney's fees and expenses . . . ." Tex. Fam. Code Ann. § 106.002(a) (West 2008). Therefore, the trial court did not abuse its discretion by awarding attorney's fees for the January 2012 custody hearing or the April 2012 emergency hearing. *See id.* However, we conclude that the trial court lacked the authority to award attorney's fees for the mandamus proceeding or the recusal proceeding. A mandamus proceeding is an original appellate proceeding seeking extraordinary relief. Tex. R. App. P. 52.1. Although the mandamus was related to the modification suit, it was an original, separate proceeding within the jurisdiction of this Court. *See In the Interest of V.T.*, No. 2-03-248-CV, 2004 WL 1353024, at *2 (Tex. App.—Fort Worth June 17, 2004, pet. denied) (mem. op.) (When father filed a petition for writ of mandamus complaining of the trial court's order denying his

motion to disqualify mother's attorney in a modification case, trial court lacked jurisdiction to award attorney's fees for the mandamus proceeding.).

With respect to the recusal proceeding, Rule 18a(h) of the Texas Rules of Civil Procedure provides that the judge who hears the motion to recuse may order the party or attorney who filed the motion, or both, to pay reasonable attorney's fees and expenses incurred by the other party if the judge finds that the motion was (1) groundless and filed in bad faith, or for the purpose of harassment or (2) clearly brought for unnecessary delay and without sufficient cause. Tex. R. Civ. P. 18a(h). Judge Underwood did not award attorney's fees to M., and the trial judge lacked authority to assess attorney's fees for the recusal proceeding. *See id*.

With respect to the children's 529 savings plans, M. argues that the trial court abused its discretion by requiring M. to sign control of the plans over to W. because the trial judge "stated no basis for his order, and there were no pleadings and no evidence to support it." As discussed above, in her counter-petition, W. requested appointment as sole managing conservator in her counter-petition, and the trial court appointed W. sole managing conservator of the children and granted W. the exclusive right to make decisions concerning the children's education. The evidence established that (1) M. opened the plans and was the participant, (2) the divorce decree provided that M. would control the 529 college savings plans, and

(3) for three years, M. put all of his bonuses into the 529 plans, which totaled approximately $437,000 at the time of trial. The evidence also established that in 2009, as part of an order permitting M. to transfer the accounts to a different brokerage firm, the trial judge enjoined M. from using any of the 529 funds for any purpose other than a "qualified higher education expense" as defined by the investment plan, and also enjoined M. from changing the beneficiary of any of the accounts without W.'s express written consent.

W. contends she "specifically placed the 529 accounts into issue in her Request for Additional Relief[,]"which she filed on September 14, 2012, and she also points to her general prayer for any and all other relief the trial court determined to be in the children's best interest and for their protection. In W.'s request for additional relief, she asked that the court order M. to provide statements for the 529 accounts to her by certified mail on the first day of each month "to insure his fiduciary duties to the children are being met[,]" but she did not request that control of the 529 plans be transferred to her. W.'s second amended counter petition, her live pleading at the time of the hearings, also did not request such relief. We conclude that ownership of the 529 savings accounts was not an issue raised by the pleadings. Therefore, the trial court abused its discretion by ordering M. to transfer ownership of the 529 savings accounts to W. *See In re Russell*, 321

33

S.W.3d 846, 855 (Tex. App.—Fort Worth 2010, orig. proceeding) ("A trial court abuses its discretion by awarding relief to a person who has not requested such relief in a live pleading."); Tex. R. Civ. P. 301 (The judgment shall conform to the pleadings.).

We sustain issue six. Accordingly, we remand the cause to the trial court to determine the appropriate amount of attorney's fees consistent with this opinion by segregating the attorney's fees that are recoverable from those that are not, as well as for entry of an order transferring ownership of the 529 savings accounts back to M. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006) ("[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees."); *Russell*, 321 S.W.3d at 855.

ISSUE SEVEN

In issue seven, M. complains of the trial court's entry of a judgment *nunc pro tunc* to correct what M. contends was a judicial error. As discussed above, upon W.'s motion, the trial judge signed a judgment *nunc pro tunc*, which contained language explicitly ordering M. to pay W. attorney's fees in the amount of $241,417.59. At the September 2012 hearing on final orders, the trial court

34

found that W.'s reasonable and necessary attorney's fees in the amount of $241,417.59 "will be taxed against [M]."

A trial court may correct a clerical error in a judgment at any time by entering a judgment *nunc pro tunc*. Tex. R. Civ. P. 316, 329b(f); *Escobar v. Escobar*, 711 S.W.2d 230, 231 (Tex. 1986). The determination of whether an error in a judgment is judicial or clerical is a question of law that we review *de novo*. *Roan v. Roan*, No. 03-09-00155-CV, 2010 WL 4260974, at *5 (Tex. App.—Austin Oct. 28, 2010, no pet.) (mem. op.); *Escobar*, 711 S.W.2d at 232. "A clerical error is a discrepancy between the entry of a judgment in the record and the judgment that was actually rendered by the court, and does not arise from judicial reasoning or determination." *Rawlins v. Rawlins*, 324 S.W.3d 852, 855 (Tex. App.—Houston [14th Dist.] 2010, no pet.). "A judicial error, on the other hand, occurs in the *rendering*, as opposed to the *entering*, of a judgment. *Id*. "A judgment is rendered when the decision is officially announced either orally in open court or by a memorandum filed with the clerk." *Id*. The trial court "can only correct the entry of a final written judgment that incorrectly states the judgment actually rendered." *Escobar*, 711 S.W.2d at 231-32.

We conclude that the trial judge's pronouncement awarded a judgment in favor of W. from M. for attorney's fees, and the failure to include in the written

judgment a provision that expressly ordered M. to pay W. attorney's fees in the amount of $241,417.59 was a clerical error that the trial court could properly correct by entry of a judgment *nunc pro tunc*. *See Escobar*, 711 S.W.2d at 231-32; *Rawlins*, 324 S.W.3d at 855. Accordingly, we overrule issue seven.

## ISSUE NINE

In issue nine, M. challenges the trial court's conclusions of law regarding joint managing conservatorship, rights and duties, and possession and access. We review a trial judge's decision on a petition to modify under an abuse of discretion standard. *In re W.C.B.*, 337 S.W.3d 510, 513 (Tex. App.—Dallas 2011, no pet.). We determine whether the trial judge acted arbitrarily or without reference to any guiding rules or principles. *Id*. Because the abuse-of-discretion standard of review overlaps with traditional sufficiency standards of review in family law cases, challenges to the sufficiency of the evidence are not independent grounds for reversal, but instead constitute factors relevant to determining whether the trial judge abused his discretion. *In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.).

M. argues that although the order appointed him a possessory conservator, the trial court's order also stripped him of nearly all parental rights and effectively denied him all possession of and access to his children, an outcome not supported

by sufficient evidence. M. points out that "while the denial of access is purportedly 'temporary,' the trial court's order does not provide any enforceable provisions for future access. Instead, future access is left to the determination of the therapist under a poorly defined 'transitory program' leading to a modified possession order on a date that is also to be determined."

A parent of the child has the right to have physical possession of the child. Tex. Fam. Code Ann. § 151.001(a)(1) (West 2008). Public policy dictates that children will have frequent and continuing contact with parents who have shown the ability to act in the children's best interest. *Id*. § 153.001(a)(1); *In re C.R.O.*, 96 S.W.3d 442, 447 (Tex. App.—Amarillo 2002, pet. denied). The trial court must consider the best interest of the children, and there is a rebuttable presumption that appointment of both parents as joint managing conservators is in the children's best interest. Tex. Fam. Code Ann. §§ 153.002, 153.131(b). There is also a rebuttable presumption that the standard possession order is in the children's best interest. *Id*. § 153.252(2). A finding by the court that a report of abuse made during the pendency of a suit affecting the parent-child relationship was false or lacking factual foundation may constitute grounds for the court to modify an order providing for possession of or access to a child who was the subject of the report

by *restricting* further access to the child by the person who made the report. *Id.* § 261.107(b) (emphasis added).

"The terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193. A trial court's discretion to make temporary orders is limited by a fit parent's right to exercise his parental rights. *See In re Scheller*, 325 S.W.3d 640, 642 (Tex. 2010) (citing *Troxel v. Granville*, 530 U.S. 57, 68, 72-73 (2000)). Using a neutral third party, such as a mental health professional, to assist with determining the most appropriate possession rights may be necessary in a complex family law situation. *In re J.S.P.*, 278 S.W.3d 414, 422 (Tex. App.—San Antonio 2008, no pet.). "[D]elegating specific issues related to possession and access [to a third party] appears to be permissible *so long as the parent maintains access to their child*, and only faces the possibility of the denial of specific periods of possession." *Id.* (emphasis added). A trial court's ability to obtain assistance from a third party is limited by the requirement that the court must maintain the power to enforce its judgment; that is, the order must be sufficiently specific to be enforceable by contempt. *Id.* at 422-23.

In *In re J.S.P.*, the child's maternal grandmother was named sole managing conservator, but the appellant father, who suffered cognitive impairment due to a head injury prior to J.S.P.'s birth, was permitted supervised visitation. *Id.* at 417. The father subsequently filed a petition to modify, in which he requested appointment as joint managing conservator with the exclusive right to designate J.S.P.'s primary residence, and he requested a standard possession order. *Id.* The trial court entered temporary orders that continued supervised visitation, but on a schedule. *Id.* After a jury trial, in which appellant was named a joint managing conservator along with the grandmother, the trial court conducted a bench trial on issues of possession and access. *Id.* At the conclusion of the bench trial, the trial court continued the supervised visitation schedule and ordered the creation by a psychologist of a transitory program intended to lead to unsupervised visitation by the father. *Id.*

W. cites *In re J.S.P.* for the proposition that orders utilizing a mental health professional to develop a transitory program must state a date by which the transitory program should be developed, a date by which the standard possession order should begin, or a deadline by which the therapist must report reasons why the transitory program could not be developed or why standard possession should not commence. W. argues that the order the trial court entered in this case meets

39

the requirements set forth in *In re J.S.P.* W. ignores the fact that *In re J.S.P.* did not involve depriving the father of all rights of visitation and access. *See id.* at 417-23.

We conclude that there is sufficient evidence in the record to support the trial court's determination that the standard possession order would not be in the children's best interest. However, there is insufficient evidence to support the trial court's order forbidding M. from contacting the children and denying M. all rights of possession and access, even on an ostensibly temporary basis. *See generally* Tex. Fam. Code Ann. § 153.193; *Moore v. Moore*, 383 S.W.3d 190, 198 (Tex. App.—Dallas 2012, pet. denied) (In family law cases, sufficiency of the evidence issues are relevant factors in determining whether the trial court abused its discretion.); *In re A.B.P.*, 291 S.W.3d at 95. The trial court therefore abused its discretion by forbidding M. from contacting the children and denying M. all rights of possession or access. Accordingly, we sustain issue nine in part, reverse the portions of the trial court's order that provide that M. have no visitation or access to the children and that M. cannot contact the children, and remand the case to the trial court for entry of an appropriate order consistent with this opinion. The trial court may consider the recommendations set forth in Dr. Abrams's February 2013 report; however, we will leave the specific terms of visitation and access to the trial

court's discretion. We need not address M.'s remaining issues, as they would not result in greater relief. *See* Tex. R. App. P. 47.1.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

_____
STEVE McKEITHEN
Chief Justice

Submitted on December 30, 2013
Opinion Delivered February 27, 2014

Before McKeithen, C.J., Kreger and Horton, JJ.